# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PAULA ANN MILLIGAN, and )
HAROLD MONTGOMERY )
MILLIGAN, )
       )
       **Plaintiffs,** )      **Case No. 3:07-1053**
       )      **Judge Trauger**
**v.** )
       )
THE UNITED STATES OF AMERICA, )
et al., )
       )
       **Defendants.** )

## MEMORANDUM

Defendants United States of America, United States Marshals Service, Wesley Terry, Craig Reese, and four Unknown U.S. Marshals[1] ("the federal defendants"), have filed a Motion to Dismiss (Docket No. 44), relying on numerous affidavits and exhibits, which the court is treating as a Motion for Summary Judgement (Docket No. 64), to which the plaintiffs have responded (Docket No. 73), and the defendants have replied (Docket No. 74). In addition, the plaintiffs have filed a Motion to Delay Consideration of the Motion for Summary Judgment (Docket No. 65), to which the defendants have responded (Docket No. 69), and the plaintiffs have replied (Docket No. 72). For the reasons discussed herein, the plaintiffs' Motion to Delay Consideration will be denied, and the defendants' Motion for Summary Judgment will be

---

[1]The plaintiffs, in their Amended Complaint, have identified two of these Marshals as Deputy Marshals Kevin Koback and Daniel Thomas Shelton. (*See* "Motion to Amend Complaint," Docket No. 62)

1

granted in part and denied in part.[2]

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, Paula Ann Milligan, was arrested by four United States Marshals and two

Metro Nashville Police officers on October 24, 2006, pursuant to "Operation Falcon III".[3] These

---

[2]The plaintiffs have, additionally, filed a Motion for Extension of Time to Respond to the United States' Motion to Dismiss. (Docket No. 82) The disposition of this motion is somewhat confusing for several reasons. First, the plaintiffs have already filed a response to the United States' Motion to Dismiss, after the court notified the parties that it would consider that motion as a Motion for Summary Judgment. (Docket No. 73) No objection to that Response has been filed, and the court has considered it. Second, the plaintiffs allege that additional time is needed because they "would like an opportunity to investigate and more fully respond to the Defendants' Motion to Dismiss based upon their assertion that Plaintiff, Harold Milligan, has not filed his SF-95." (Docket No. 83 at p. 2) The defendants do not, however, argue that Mr. Milligan has failed to file this specific document. Mr. Milligan's SF-95 appears to be related to the exhaustion requirement for claims filed under the Federal Tort Claims Act. The defendants, in their Motion to Dismiss, pointed out that the Federal Tort Claims Act—which the plaintiffs had nowhere invoked in their Complaint—required exhaustion of administrative remedies, which the plaintiffs had nowhere alleged. (Docket No. 45 at p. 7) In their First Amended Complaint, the plaintiffs still do not allege a claim under the Federal Tort Claims Act or allege that they have exhausted their administrative remedies under that Act. (*See* Docket No. 76) The exhaustion of administrative remedies requires not just the filing of this form, but also that the claim must be ultimately denied by the agency in writing, and that the denial must be sent to the plaintiff by registered or certified mail. 28 U.S.C. § 2675(a). Accordingly, the fact that Mr. Milligan has filed his SF-95 would not itself satisfy the exhaustion requirement. Of course, the exhaustion requirement may eventually be met, at which time the plaintiffs could file a Second Amended Complaint alleging an action under the Federal Tort Claims Act, including, along with that claim, allegations that the specific requirements for exhaustion have been met. The court will, at present, deny the plaintiffs' Motion for Extension of Time as moot.

[3]Unless otherwise noted, the facts have been drawn from the plaintiffs' First Amended Complaint (Docket No. 76), the plaintiffs' Memorandum in Support of its Motion to Delay Consideration (Docket No. 66), the plaintiffs' Affidavits of Andrew C. Clarke and Debrah Frizzell (Dockets No. 67, 68), the plaintiffs' Reply in Support of its Motion to Delay Consideration (Docket No. 72), and the plaintiffs' Response to the defendants' Motion for Summary Judgment (Docket No. 73), in accordance with the court's task in analyzing a motion for summary judgment to determine whether the "nonmoving party [has] come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) (emphasis added)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28

2

officers did not rely on the actual arrest warrants in arresting the plaintiff, but instead relied upon a spreadsheet naming a Paula Milligan, a.k.a. Rebecca Stapps,[4] for whom four outstanding warrants existed, and providing a North Carolina address for this person. The spreadsheet also contained the plaintiff's proper date of birth and Tennessee driver's license number. The defendants admit that, in arresting the plaintiff, they arrested the wrong person.

The defendants have neither turned over any of the four arrest warrants for Paula Milligan, a.k.a., Rebecca Stapps, to the plaintiffs in discovery nor produced those warrants to the court as a part of their defense. However, the plaintiffs have produced the original complaint, indictment, and capias for Ms. Milligan a.k.a. Stapps. These documents identify a 5' 3'', 24-year-old, white female with brown hair and blue eyes, a North Carolina driver's license, and an address in Goldsboro, North Carolina. The plaintiff, in contrast, is a 5'6'', 42-year-old, white female with blond hair and brown eyes, a Tennessee driver's license, and an address in Antioch, Tennessee.

Defendant Kevin Koback, a Deputy U.S. Marshal, received the spreadsheet in question

---

U.S.C. App., p. 626 (the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the plaintiff's proof does not adequately rebut the proof provided by the defendant, the court so notes this deficiency by adopting the defendant's fact and citing to the defendant's pleading, affidavit, or other document. However, where the plaintiff has admitted a fact alleged by the defendant, the court merely draws this fact from the plaintiff's admission, and does not cite to the defendant's pleading, affidavit, or other document.

[4]United States Marshals Koback and Anderson allege that they never had any information linking Rebecca Stapps to the warrants at issue. (Docket Nos. 47, 48) If that is the case, the officers could not have viewed the original indictment or capias for the fugitive in question. (Docket No. 73, Ex. 5, 6) In light of the fact that all of these documents include the "Rebecca Stapps" name, it is more likely than not that the warrants themselves—which the defendants have not submitted to the plaintiffs or to the court—also contained that name.

via email. The spreadsheet listed the names of 1300 persons with outstanding warrants. Mr. Koback sent the spreadsheet to an individual working with the Tennessee Bureau of Investigation, who performed identifying information searches through various databases, ultimately finding the plaintiff's name and identifying information, and linking it with the outstanding warrants referenced on the spreadsheet. (Docket No. 47 at p. 3). This information was placed into an arrest file. In addition, the Tennessee Bureau of Investigation performed a criminal record check that revealed that the plaintiff had no criminal record on the national crime database, no outstanding warrants, and no local warrants. This information was entered into a worksheet, which was placed in the arrest file. The worksheet also contained a section asking whether or not the warrant for the individual in question had been "confirmed." This section was left blank.

Although the arresting officers appear not to have actually seen the warrant, the arrest file contains the date for the issuance of the warrant as April 27, 2006.[5] This date, according to the plaintiffs, could not have been discovered without at least one of the officers having seen the warrant. In that case, according to the plaintiffs, it should have been readily apparent that the

_____

[5]In their memorandum in support of their motion for summary judgment, the federal defendants allege that "[t]he law enforcement officers participating in Operation Falcon III had in their possession a warrant for the arrest of Paula Milligan, and identifying information that squared completely with the plaintiff Paula Milligan, including a color photograph of her." (Docket No. at p. 17). However, the defendants also allege that the arrest file, in which the color photograph of Mrs. Milligan was held, was created by reference to a spreadsheet that had issued from the Warrants Division of the Metro Nashville Police Department, and not by reference to the warrants themselves. (*Id*. at p. 15) The arrest file, which has been filed with the court under seal, does not include those warrants. (*See* Docket No. 57) Finally, the capias and indictment—which, in the absence of the actual warrants themselves, are probative of the information the warrants contained—include information that contradicts the information that was in the arrest file and that does not match with Mrs. Milligan's appearance, address, or driver's license.

plaintiff was not the proper person to be arrested.

Defendant Daniel Shelton, a Deputy U.S. Marshal and Public Affairs Officer, was the media coordinator for "Operation Falcon III". Deputy Marshal Shelton alleges that the coordination with local media was undertaken pursuant to established U.S. Marshal Service Media Guidelines, and that approval for the media coordination was ultimately given by the national headquarters of the Marshal Service in Arlington, Virginia. (Docket No. 51 at p. 2-3). Deputy U.S. Marshal Shelton selected the team that arrested Mrs. Milligan, followed them in a separate vehicle, and watched, from afar, the arrest. (*Id*. at p. 3-4)

On the morning of October 24, 2006, the defendants arrived at the plaintiffs' home and demanded entry. Plaintiff Monty Milligan was, at this time, having a telephone conversation with his wife, plaintiff Paula Ann Milligan, who was away from home, dropping the couple's four-year-old daughter off at day care. The officers demanded to speak with Mrs. Milligan. Mr. Milligan handed the phone to a U.S. Marshal who, after identifying himself to Mrs. Milligan, told her to come home right away or else she would be arrested at her place of employment. Accordingly, Mrs. Milligan drove home.

While she was en route, the officers began searching the plaintiffs' home. One of the officers looked inside a file and said "this just does not look right." (Docket No. 73, p. 13) This same officer told Mr. Milligan that the Milligan home closely resembled that of the officer and asked Mr. Milligan whether any unexplained or large amounts of money had been deposited in the plaintiffs' bank account, to which Mr. Milligan responded, "No." Mr. Milligan asked the officers why they intended to arrest his wife but was given no answer.

Before Mrs. Milligan arrived home, the arresting officers left the Milligans' living room

and went outside, planning to make the arrest in the front yard. At approximately 8:24 a.m., Mrs. Milligan arrived home and was told by a male officer that she was being arrested for multiple counts of forgery. Mrs. Milligan stated, "Obviously there has been some mistake here." (*Id.* at p. 13-14) An officer wearing a Metro police uniform replied, "Well, often that is the case; there are times when it is just a big mistake." (*Id.* at 14)

The officers first told Mrs. Milligan that they would wait until she was inside the police car to handcuff her but, soon afterwards, a cameraman ran towards Mrs. Milligan and began filming her. The officer handcuffed Mrs. Milligan, and the act was caught on film. Mrs. Milligan was crying hysterically. The officers placed Mrs. Milligan in the patrol car, and the car was set into motion. Mrs. Milligan protested that the officers were arresting the wrong person. The officers asked Mrs. Milligan if she had ever lived in North Carlina. Mrs. Milligan answered, "No." Mrs. Milligan was taken neither to a police station nor before a magistrate judge, but was taken instead to LP Field, where she was transferred into the custody of other government officials. She remained outdoors and in handcuffs for an extended period. Because she was continuing to cry, Mrs. Milligan alleges that her tears and nasal secretions were running into her mouth, but that she could not wipe her mouth because she remained handcuffed. Mrs. Milligan was eventually transported to an underground parking lot or garage where she was placed inside a cage. Over the next few hours, Mrs. Milligan was moved from the cage and a man, who identified himself as a nurse, drew her blood without her permission. Mrs. Milligan was handcuffed to a long chain with several other prisoners and walked, along with these prisoners, from one building to another, where Mrs. Milligan's fingerprints were taken.

Later, Mrs. Milligan was held at a jail operated by the City of Nashville, Tennessee, until

6

her husband was able to post bond, approximately six or seven hours after her arrest. Mrs. Milligan alleges that, during this time, she was given access only to toilets that were so filthy as to preclude their use. Defendant Sinclair Television broadcasted Mrs. Milligan's arrest as a part of a nationally publicized, multi-state round up of "the worst of the worst." (Docket No. 76 at p. 14) On November 1, 2006, the criminal charges against Mrs. Milligan were dismissed by the Criminal Court for Davidson County, Tennessee, finding that Mrs. Milligan was "not the correct person for whom the Indictment and Capias were issued" and that she "was mistakenly arrested, charged, booked and jailed by United States, State and local law enforcement officers." (Docket No. 73, Ex. at p. 2) On November 3, 2006, the plaintiffs gave notice to several television news outlets, including Sinclair Television, informing them that all charges against Mrs. Milligan had been dismissed, that her arrest had been improper, and requesting that the outlets cease and desist publishing footage of the arrest. On November 10, 2006, Mrs. Milligan discovered that her arrest video was still being published on the internet website of WZTV Fox 17, a Nashville Tennessee station owned by Sinclair Television.

On October 23, 2007, plaintiffs Paula Ann Milligan and Harold Montgomery Milligan filed this action, alleging: (1) violations of Mrs. Milligan's constitutional rights for being falsely arrested against both federal and municipal defendants; (2) violations of both plaintiffs' constitutional rights for being subjected to unconstitutional searches, against both federal and municipal defendants; (3) a *Monell* pattern and practice claim for unconstitutional polices, practices, and/or customs against the United States Marshals Service and the Metropolitan Police Department; (4) the tort of false light against all defendants; and (5) the tort of libel against all defendants. (Docket No. 1) On April 1, 2008, the plaintiffs filed a First Amended Complaint,

alleging the same causes of action. (Docket No. 76)

On January 18, 2008, defendants United States of America, United States Marshals Service, Wesley Terry, Craig Reese, and the four Unknown U.S. Marshalls (two of who have been subsequently identified as Deputy Marshals Kevin Coback and Daniel Thomas Shelton) moved to dismiss all counts against them (Docket No. 44), and on February 11, 2008, the court notified the parties that it would treat that motion to dismiss as a motion for summary judgment. (Docket No. 64) On February 25, 2008, the plaintiffs moved to delay consideration of the motion for summary judgment under Rule 56(f) of the Federal Rules of Civil Procedure. (Docket No. 65)

## ANALYSIS

### I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to

weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiffs' claims.

## II.     Qualified Immunity

The federal defendants have each raised the defense of qualified immunity as to the

plaintiffs' claims against the officers in their individual capacities.[6]  Government officials

performing discretionary functions pursuant to their employment "are shielded from liability

through 'qualified immunity' if they violate an individual's constitutional rights," but the rights

were not "'clearly established' at the time" they were violated.  *Marvin v. Taylor*, --- F.3d ----,

2007 WL 4232968 at *7 (6th Cir. Dec. 4, 2007) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)).  The defense "shields government officials from 'liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Humphry v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007)

(quoting *Harlow*, 457 U.S. at 818); *see also Smoak v. Hall*, 460 U.S. F.3d 768, 777 (6th Cir.

2006).

---

[6]The plaintiffs have conceded all of the federal defendants' arguments in favor of dismissal except for the qualified immunity defense, which applies only to the plaintiffs' claims against the individual U.S. Marshals and Deputy U.S. Marshals, known and unknown.  (*See* Docket No. 70 at p. 1; 73 at p. 1)  That is, the plaintiffs have conceded that sovereign immunity bars all claims asserted against the United States and the United States Marshal Service, and that the individual federal defendants cannot be sued for injunctive or declarative relief in their individual capacities.  The plaintiffs also concede that the claims against the individual federal defendants in their official capacities are barred by the doctrine of sovereign immunity.  As discussed below, however, this concession was made partly in error.  Congress has waived sovereign immunity for official capacity suits for declaratory or injunctive relief.  *See* 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690-91 (1949).  In any event, the plaintiffs also concede that these claims for injunctive relief also fail to present a "real and immediate threat" that the plaintiffs will, in the future, be subject to the harms that they have previously suffered, as is required for Article III standing.  The plaintiffs "expressly deny that the official capacity actions against Defendants Reese and Terry are subject to dismissal because said Defendants are employees of Defendant Nashville which is subject to suit pursuant to 42 U.S.C. Section 1983."  (Docket No. 70 at p. 2)  However, the plaintiffs do not deny that Defendants Reese and Terry were deputized as U.S. Marshals in order to perform the very actions that are at issue in this case, and the plaintiffs have not presented any evidence contradicting Defendants Reese's and Terry's statements that, at all times relevant to this case, they were acting in their capacities as Deputy U.S. Marshals, assigned to work on Operation Falcon III.  (Docket Nos. 49 at p. 1; 50 at p. 1)  There is simply no factual dispute that Defendants Reese and Terry were acting in any other capacity during the events in question.

That is, "'[q]ualified immunity is *an immunity from suit* rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial.'" *Marvin*, 2007 WL 4232968 at *7 (emphasis in original) (quoting *Scott v. Harris*, --- U.S. ----, ----, 127 S.Ct. 1769, 1774 n. 2 (2007)); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, qualified immunity operates to defeat a plaintiff's constitutional claim against a police officer who made "a decision that, even if constitutionally deficient, reasonably misapprehend[ed] the law governing the circumstances." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also Saucier v. Katz*, 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force.'")

In order to effectuate qualified immunity as an "immunity from suit" rather than a defense to liability, the Supreme Court has promulgated a two-part inquiry for analyzing this issue: "the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established," the court must address "whether the right was *clearly* established . . . on a . . . specific level." *Saucier*, 533 U.S. 194, 200 (2001) (emphasis added). The Sixth Circuit has recently reiterated that "[t]he issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'" *Humphry*, 482 F.3d at 846 (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989)).[7]

---

[7]This should be a rare situation. The Supreme Court has directed that the first inquiry should be analyzed on the facts alleged by the plaintiff, and the second inquiry—whether a given right is clearly established—is primarily a question of law, under an objective reasonableness standard. *Saucier*, 533 U.S. at 200-02; *Forsyth*, 472 U.S. at 526 (Qualified immunity "recognize[s] an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the *essentially legal question* whether the conduct of which *the plaintiff*

11

### A. Whether The Allegations Establish A Constitutional Violation

The threshold question requires the court to consider, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* Of course, if the allegations support "no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity." *Marvin*, 2007 WL 4232968 at *8 (citing *Scott*, 127 S.Ct. at 1779).

The plaintiffs allege two constitutional violations against the individual federal defendants: first, that Mrs. Milligan's arrest constituted an unlawful seizure in violation of the Fourth Amendment and, second, that the search of the Milligan home constituted an unlawful search in violation of the Fourth Amendment.

### 1. The Arrest

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A "seizure" of an individual takes place when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "It is a well-settled principle of constitutional jurisprudence that an arrest without

---

*complains* violated clearly established law.") (emphasis added). Put another way, determining qualified immunity issues at the pre-trial stage, rather than submitting such questions to the jury, is required by the conception of this immunity as an "immunity from suit." *See Forsyth*, 472 U.S. at 526 ("The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.")

probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment."
*Ingram v. City of Columbus*, 185 F.3d 579, 595 (6th Cir. 1999). The Sixth Circuit has explained
that, "[w]here the police have probable cause to arrest one party but reasonably mistake a second
party for the first, their arrest of the second party is valid." *Ingram*, 185 F.3d at 595 (6th Cir.
1999) However, this mistake must be reasonable. While "'room must be allowed for some
mistakes' in officers' determinations of probable cause, 'the mistakes must be those of
reasonable men, acting on facts leading sensibly to their conclusions of probability.'" *Ingram*,
185 F.3d at 596 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

As a general rule, the Sixth Circuit and the Supreme Court have held that, where police
officers rely on a facially valid warrant—and where that reliance is reasonable—no
constitutional violation has occurred. *See Hill v. California*, 401 U.S. 797, 803-04 (1971);
*Jackson v. Holyman*, 12 F.3d 212, 1993 WL 50159 at *3 (6th Cir. 1993) (unpublished) ("[P]olice
. . . may rely on facially valid arrest warrants even in the face of vehement claims of innocence
by reason of mistaken identity or otherwise.") (quoting *Masters v. Crouch*, 872 F.2d 1248, 1253
(6th Cir. 1989)). However, that reliance must be reasonable, and where the warrant is clearly
made out for a person other than the one who was arrested, or where there is a question as to the
warrant's validity itself, an arrest can violate the Fourth Amendment. *See Brown v. Byer*, 870
F.2d 975, 979 (5th Cir. 1989) ("The existence of a facially valid warrant for the arrest of one
person does not authorize a police officer to effect the arrest of another person, even if the officer
believes the second person guilty of the first person's crimes and even if the two people have
similar names.").

In the present case, as the record currently exists, there is a factual issue as to whether the

13

arresting officers relied on the warrants in making the arrest, and as to what the warrants actually said. In order for an officer to reasonably rely on a facially valid warrant, that warrant—and not merely a spreadsheet including some of the information on the warrant—must actually be consulted. Although a mistaken-identity arrest based purely on probable cause, and without a warrant, has been found to be constitutional, *see Hill v. California*, 401 U.S. at 802, the hallmark of constitutionality in these cases is reasonableness, and where warrants have been issued but are not consulted, that weighs heavily against a finding of reasonableness. Furthermore, although the warrants themselves have not been produced, the original complaint, indictment and capias are strong evidence of the information that was actually contained on those documents. Both the indictment and capias describe a woman twenty years younger than Mrs. Milligan, with substantially different features, a North Carolina driver's license and North Carolina address. The complaint names a "Paula Rebecca Stapps," with an address in Goldsboro, North Carolina. Accordingly, there is at least a factual dispute as to whether, even if the officers had relied on the warrants, that reliance could be considered reasonable.

In *Hill v. California*, 401 U.S. at 799, the Supreme Court addressed a case where the police, without an arrest warrant but with probable cause to arrest a suspect named Hill, arrested a man named Miller instead, thinking that he was Hill because he fit the description and answered the door at Hill's address. The case arose not on a cause of action brought by the wrongfully arrested Miller, but instead on a motion to exclude evidence that was obtained pursuant to the arrest. *Id*. at 802. The Court held that the arrest had not violated the Fourth Amendment, finding that "the police had probable cause to arrest Hill and that the arresting officers had a reasonable, good faith belief that the arrestee Miller was in fact Hill." *Id*. at 803.

14

This finding was based on the fact that Miller fit Hill's description, was inside the apartment, which was locked, and that Miller's explanation for his mode of entry was not convincing. *Id*.

Subsequent courts have cited *Hill* for the proposition that, although reasonable mistakes can be made in ascertaining the correct identity of an arrestee without implicating the Fourth Amendment, where questions of fact exist as to the reasonableness of the mistake, summary judgment should not be granted. *See Ingram*, 185 F.3d at 592-93. In *Ingram*, a suspect fled into a home after offering to sell police officers narcotics; the police officers entered the home and arrested another man with a different complexion, who had been napping in the basement of the home. *Id*. at 596. The court found that genuine issues of fact existed as to the reasonableness of the arrest. *Id*.; *see also Lee v. Gregory*, 363 F.3d 931, 935 (9th Cir. 2004) ("Knowingly arresting the wrong man pursuant to a facially valid warrant issued for someone else violates rights guaranteed by the Fourth Amendment.").

In *Berg v. County of Allegheny*, 219 F.3d 261, 266-67 (3d Cir. 2000), the Third Circuit addressed a situation where a warrant clerk mistakenly transposed two numbers in the criminal complaint number for a fugitive, resulting in the wrong name appearing on the warrant. Noticing that the name, when entered into the criminal database, called up different personal information, a peace officer changed the information on the warrant to match. *Id*. The result was the mistaken arrest of the plaintiff. *Id*. The court found that the plaintiff's case against the arresting officer survived summary judgment, reasoning that "an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the circumstances." *Id*. at 273. The court stated that "[s]uch circumstances include, but are not limited to, other information that the officer possesses or to which he has reasonable access, and whether failing

15

to make an immediate arrest creates a public threat or danger of flight." *Id*.

In the case at hand, the officers arrested an individual who, as in *Ingram*, shared very few physical characteristics with the fugitive for whom probable cause to arrest actually existed, relying, as in *Berg*, on data that had been somehow incorrectly entered. Moreover, unlike *Ingram* or *Berg*, actual arrest warrants existed and yet may not have been properly consulted. The arrest was made, at least in part, pursuant to a spreadsheet including little information and in the face of criminal search histories having revealed that the Mrs. Milligan had no criminal history. The arrest file, prepared by the Tennessee Bureau of Investigation, included a photograph of the plaintiff, presumably from her driver's license. How that photograph came to be included, and not a photograph from the fugitive's North Carolina driver's license, is unclear. However, it is clear that the inclusion of this photograph was a mistake. Reliance on that mistake was only constitutional if it was reasonable.

Deputy Marshals Terry and Reese each participated in the arrest. They covered the back of the house, drove Mrs. Milligan to LP Field, and then delivered her to the local Sheriff's Department's personnel. Officer Douglas Anderson, who had been deputized as a special U.S. Marshal, attests that he was given the file that had been compiled by the Tennessee Bureau of Investigation and that "[t]here was no information in the file that contraindicated the plaintiff Paula Milligan." (Docket No. 45 at p. 16) However, the original criminal complaint, capias, and indictment certainly do contraindicate Mrs. Milligan. Those documents contain information that directly contradicts the information gathered by the Tennessee Bureau of Investigation, from which the trier of fact could easily conclude that the warrants themselves also contradicted that information. The defendants allege that "[t]he law enforcement officers participating in

16

Operation Falcon III had in their possession a warrant for the arrest of Paula Milligan, and identifying information that squared completely with the plaintiff Paula Milligan, including a color photograph of her." (*Id*. at p. 17) But this contention is simply contradicted by the documents that have been produced, which do not include any warrants. There is, even with very little discovery, a most definite factual dispute as to the reasonableness of the arresting officers' reliance on the information that they had at the time of the arrest. Accordingly, the plaintiffs have stated a constitutional violation as to those officers.

Not all of the named federal defendants were arresting officers, however. Defendant Koback, for instance, worked with the Tennessee Bureau of Investigation to create the arrest file that was ultimately used by the arresting officers, which included the false information that led to Mrs. Milligan's arrest. In *Berg*, 219 F.3d at 274, the Third Circuit addressed this very issue, finding that an officer's decision to change the information in a computerized court information center, based on his own clerical error, did not meet the constitutional standard under either the Fourth or Fourteenth Amendments for liability; that is, there was no evidence that the officer had intentionally caused the plaintiff's arrest or acted with deliberate indifference. The same is true for defendant Koback. There is no evidence in the record indicating that Koback acted intentionally to cause the arrest of Mrs. Milligan, or acted with deliberate indifference to the possibility of her wrongful arrest. Accordingly, summary judgment must be granted to defendant Koback as to this charge.

Defendant Shelton, on the other hand, aside from his media coordination duties, did select the arrest team and travel along with the team, in a separate car, to supervise the arrest. In addition, Defendant Shelton alleges that he "assisted in contacting several sheriff's departments

and local police departments in Middle Tennessee, requesting lists of their outstanding arrest warrants, and personnel who could participate in the operation."  (Docket No. at p. 3)  After receiving lists of the wanted individuals, Defendant Shelton "did some investigation on the names, then turned them over to another task force officer for further development."  (*Id*.)  In order for supervisory liability to attach for constitutional violations, "a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 872 (6th Cir. 1982); *see also DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418, 429-30 (6th Cir. 2006) (citing the same standard); *Gibson v. City of Clarksville, Tennessee*, 860 F. Supp. 450, 453 (M.D. Tenn. 1993) ("When the supervisor has actual notice of unlawful conduct . . . , the supervisor may be held liable for failure to protect the prisoner under the theory that the supervisor ratified such unlawful conduct.").  Under the factual record as it currently exists, there is at least a factual dispute as to whether Defendant Shelton had actual notice of the unlawful conduct at issue.

### 2.    The Search

Next, the court must determine whether the plaintiffs have properly alleged a constitutional violation as to the search of their home.  The search was not undertaken pursuant to a valid search warrant.  Although the court has not seen the warrants themselves, it is undisputed that they were warrants for arrest and not search warrants.  A "search of the house or office is generally not reasonable without a warrant issued on probable cause;" however, there are contexts "where the public interest is such that neither a warrant nor probable cause is required."  *Maryland v. Buie*, 494 U.S. 325, 332 (1990).  For instance, the Sixth Circuit has

18

recognized that, "[d]uring a search incident to an arrest occurring inside a home, officers may 'as a precautionary matter and without probable cause or a reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) (quoting *Maryland v. Buie* 494 U.S. at 334). In addition "officers may conduct a search more pervasive in scope when they have 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* (quoting *Buie*, 494 U.S. at 334).

The officers in this case did not make an in-house arrest; instead, they chose to arrest Mrs. Milligan outside, in view of television cameras. The Sixth Circuit has not adopted a bright-line rule that a protective search is never justified when the arrest occurs outside the home; however, the Sixth Circuit has held that, "where a defendant is arrested outside a home, 'a warrantless search of the apartment could be justified only if the officers had a specific, reasonable basis for believing . . . that they were in danger from persons inside . . . .'" *Id.* (quoting *United States v. Calhoun*, 49 F.3d 231, 234 n.3 (6th Cir. 1995)). Accordingly, "in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers," and "the fact that the arrest takes place outside rather than inside the home affects only the inquiry into whether the officers have a reasonable articulable suspicion that a protective sweep is necessary by reason of a safety threat." *Id.* (citing *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995)).

The federal defendants allege that, "given the information that they had in hand, that the

19

'Paula Milligan' they were seeking was wanted for a felony warrant, the officers had a reasonable concern that their safety might be jeopardized," citing *Colbert* in support of this contention. (Docket No. 45 at p. 17) However, in *Colbert*, the Sixth Circuit was quite clear that the perceived dangerousness of the individual to be arrested is "irrelevant to the inquiry into whether the police had a reasonable suspicion of danger." 76 F.3d at 777. Instead, "[t]he facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual." *Id.* The Court further explained that, "[i]f district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep." *Id.*; *see also United States v. Edgerson*, 243 Fed. Appx. 974, 975 (6th Cir. 2007) ("A protective sweep of a residence, conducted after an arrest has been made outside the residence, is justified only if the officers can demonstrate an articulable basis for their reasonable belief that *someone else inside the house* might pose a danger to them.") (internal quotations omitted) (emphasis in original); *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) (although "there could always be a dangerous person concealed within a structure. . . . that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*").

The plaintiffs have presented, by affidavit of Mr. Milligan, testimony that the arresting officers searched the plaintiffs' home *before* they went outside to arrest Mrs. Milligan. The defendants have articulated no reason to believe, in this situation, that some other dangerous person occupied the house. Accordingly, the plaintiffs have alleged a constitutional violation for

20

an unreasonable search under the Fourth Amendment.  However, because they were not actually

involved in the search, defendants Koback and Shelton will be granted summary judgment as to

this claim.

**B.      Whether The Constitutional Violation Was Clearly Established**

Next the court must determine whether these alleged violations of the Fourth Amendment

were clearly established.  In *Saucier*, the Supreme Court explained that "[t]he relevant

dispositive inquiry in determining whether a right is clearly established is whether it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Saucier*, 533 U.S. at 202.  It is not enough to state the general proposition that the Fourth

Amendment protects against unlawful searches and seizures; rather, "the right the official is

alleged to have violated must have been 'clearly established' in a more particularized, and hence

more relevant sense:  The contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right."  *Id*. (quoting *Anderson v.

Creighton*, 483 U.S. 635, 640 (1987)).  In performing this analysis, the court "must look first to

decisions of the Supreme Court, then to the decisions of [the Sixth Circuit Court of Appeals] . . .

and finally to decisions of other circuits."  *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir.

2002).  That a violation was clearly established "can be apparent from direct holdings, from

specific examples described as prohibited, or from the general reasoning that a court employs."

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, U.S. 730 (2002)).

**1.      The Arrest**

With regard to the arrest, the question is whether a reasonable officer would have

understood that arresting Mrs. Milligan under the circumstances violated her constitutional

rights. This is an objective issue, and has been put the following way: "whether a reasonable officer in [the defendants'] position could believe that there was a reasonable cause to believe that [the plaintiff] was the person named on the warrant." *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir. 1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("The relevant question in this case . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed."). This question rests ultimately on factual issues that are presently in dispute.

In *Blackwell*, the Fifth Circuit found that "no inference can be drawn that [the arresting officer] knew or believed he was or likely was arresting someone other than Melinda Allen", because the plaintiff "was of the same height and weight, sex, race, age, and nickname, and at the location where he expected to find Melinda Allen." 34 F.3d at 304. Moreover, in *Brown*, 870 F.2d at 979, the Fifth Circuit noted that "[t]he existence of a facially valid warrant for the arrest of one person does not authorize a police officer to effect the arrest of another person, even if the officer believes the second person guilty of the first person's crimes and even if the two people have similar names."

In the case at hand, unlike *Blackwell*, there are two possible negative inferences that can be drawn. In light of the fact that the arrest file that has been filed with the court does not contain the arrest warrants and that, in one worksheet that was filed with the court, a box asking whether the warrants had been "confirmed" was left blank, an inference can be drawn that the defendants arrested Mrs. Milligan without actually viewing the arrest warrants. A reasonable officer would not fail to consult the actual arrest warrants before making an arrest.

22

In addition, other documents, namely, the original criminal complaint, the indictment, and the capias, create a strong inference that the warrants would have contained information that strongly contraindicated Mrs. Milligan. Those documents describe a person twenty years younger than Mrs. Milligan, with substantially different features, living in North Carolina and with a North Carolina driver's license. A reasonable officer could not have relied on warrants containing similar information in arresting Mrs. Milligan. Finally, the arrest report that the officers expressly did rely upon contained criminal history searches of Mrs. Milligan that had produced no results. All of this evidence creates at the very least a factual dispute as to the objective reasonableness of any belief on the part of the officers that the arrest was lawful.

### 2. The Search

With regard to the search of the Milligans' home, the question is whether a reasonable officer would have understood that searching the home, after already receiving information that Mrs. Milligan was not at home, and not incident to any arrest that occurred inside the home, was a constitutional violation. As has been explained above, protective sweeps of a home that are undertaken even though the defendant is arrested outside the home are prohibited, unless there are facts "giving rise to a suspicion of danger from attack by a third party during the arrest" and cannot be justified by "the dangerousness of the arrested individual." *Colbert*, 76 F.3d at 777.

The rule announced in *Colbert* has been clearly established in the Sixth Circuit and elsewhere. *See United States v. Pihlblad*, 142 F.3d 437 (Table), 1998 WL 165150 at *3 (6th Cir. 1998) (holding that a search did not "meet the requirements of a protective sweep" because "[t]he government fails to point to a single 'articulable fact' that would have caused the police reasonably to think a dangerous person remained in the house after [the defendant] was arrested

23

outside"); *United States v. Winston*, 444 F.3d 115, 125 (1st Cir. 2006) ("Every one of our own cases addressing the propriety of a protective sweep has turned on the searching officers' suspicion, *vel non*, based on some affirmative evidence, that a particular and identifiable individual . . . remained in the building that was searched."); *United States v. Gandia*, 424 F.3d 255, 264 (2d Cir. 2005) ("Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties."); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) ("[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case.")

The defendants have proffered no justification for the search other than the perceived dangerousness of Mrs. Milligan. Under *Colbert* and the other cases cited above, that suspicion of danger simply cannot justify a warrantless search of a home at all, let alone *before* the arrest is ever even made. Accordingly, the plaintiffs have met their burden, on summary judgment, to show that a reasonable officer would have understood that this search violated the Milligans' constitutional rights.

## III.     Sovereign Immunity

Defendants United States of America, United States Marshals Service, and the individual federal defendants in their official capacities have raised the defense of sovereign immunity as to all of the plaintiffs' claims. The plaintiffs have conceded these defenses; however, because the application of sovereign immunity is a jurisdictional question, the court will address it below.

### A.     Immunity of the United States and United States Marshals Service

24

The United States and its agencies are absolutely immune from suit except insomuch as the United States has expressly waived that immunity. *United States v. Shaw*, 309 U.S. 495, 500-01 (1940). This waiver cannot be implied, but must be unequivocally expressed, and its existence is a prerequisite for federal jurisdiction. *See United States v. King*, 395 U.S. 1, 4 (1969); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Blackmar v. Guerre*, 342 U.S. 512, 515 (1952) ("When Congress authorizes one of its agencies to be sued eo nomine, it does so in explicit language or impliedly because the agency is the offspring of such a suable entity.")

In *Bivens v. Six Unknown Agends of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), the Supreme Court found that the Fourth Amendment constituted a waiver of sovereign immunity in actions against federal officers sued in their individual capacities. *Bivens* has not, however, been expanded to include actions against the United States itself, or against federal agencies. *See Nuclear Transport & Storage, Inc. v. United States*, 890 F.2d 1348, 1352 ("Since the United States has not waived its sovereign-immunity and consented expressly to be sued in a *Bivens*-type action, such suits cannot be brought against the United States.") (quoting *Mid-South Music Corp. v. U.S. Dep't of the Treasury*, 579 F. Supp. 481, 483 (6th Cir. 1983), *aff'd in part, rev'd in part*, 756 F.2d 23 (6th Cir. 1984)). In fact, in *Bivens*, the Court based its holding in part on the fact that no such actions were permitted, reasoning that, where plaintiffs could demonstrate that a federal agent had violated their Fourth Amendment rights, some federal remedy should be available. *Bivens*, 403 U.S. at 397; *see also id*. at 410 (Harlan, J. concurring) ("However desirable a direct remedy against the Government might be as a substitute for

25

individual official liability, the sovereign remains immune to suit.")  Accordingly, *Bivens*

provides no basis for raising constitutional claims against either the United States or the U.S.

Marshals Service.  The plaintiffs have not identified any alternative basis for this court to

exercise its jurisdiction over the United States on its constitutional claims.  Accordingly, the

United States and U.S. Marshals Service must be granted summary judgment as to those claims.

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*., might provide this

court with jurisdiction over some of the plaintiff's tort claims against the United States, except

for the fact that the plaintiffs admit that they have not exhausted their administrative remedies

with regard to those claims.  Exhaustion of remedies is a prerequisite to jurisdiction under the

FTCA.  28 U.S.C. § 2675(a); *see also Blakely v. United States*, 276 F.3d 853, 864 (6th Cir. 2002)

("The government has waived its sovereign immunity to suits for tort actions under the FTCA,

but only insofar as the plaintiff has exhausted his administrative remedies."); *Lundstrum v. Lyng*,

954 F.2d 1142, 1145 (6th Cir. 1991) ("A prerequisite to suit under the FTCA, . . . is the

exhaustion by the plaintiff of administrative remedies.").  Because the plaintiffs have not

exhausted their administrative remedies under the FTCA, that statute cannot confer jurisdiction

over the United States or the U.S. Marshals.

### B.        Official Capacity Claims

The plaintiffs have also named the known and unknown U.S. Marshals in their official

capacities as defendants.  Official capacity suits "generally represent only another way of

pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473

U.S. 167, 165 (1985) (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690

(1978)).  A suit against a government officer in his or her official capacity "is not a suit against

26

the official but rather a suit against the official's office." *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)).

Accordingly, the United States' and United States Marshals Service's defense of sovereign immunity should apply, absent waiver. *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 729 (6th Cir. 2004) ("[S]overeign immunity is a defense in suits against government officials when sued in their official capacity."); *Hampton v. Marion*, 98 Fed. Appx. 410, 412 (6th Cir. 2004) ("Federal employees sued in their official capacity are immune from suit unless sovereign immunity has been expressly waived.")

The plaintiffs have identified no applicable waiver of sovereign immunity. However, in 1976, Congress did pass legislation waiving sovereign immunity where plaintiffs seek injunctive or declaratory relief against employees of federal agencies:

> An action in a court of the United States seeking relief other than monetary damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702; *see also Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005) ("Sovereign immunity is . . . not a bar to Mr. Simmat's action for injunctive relief."); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); *Newsome v. Vanderbilt University*, 653 F.2d 1100, 1107 (6th Cir. 1981) ("An action seeking relief other than money damages and stating a claim that the agency acted or failed to act in official capacity shall not be dismissed because it is against the United States."). Because federal sovereign immunity is jurisdictional in nature, the court is compelled to raise this statutory waiver *sua sponte*.

27

In addition, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d at 1329 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690-91 (1949) (holding that, where it is alleged that the federal officials "were acting unconstitutionally or pursuant to an unconstitutional grant of power," sovereign immunity does not apply in cases for prospective relief)). In *TransAmerica Assur. Corp. v. Settlement Capital Corp.*, 489 F.3d 256, 260 n. 2 (6th Cir. 2007), the Sixth Circuit noted that "*Larson* . . . articulated two circumstances . . . where an officer suit requesting specific relief would not implicate sovereign immunity: (1) where the officers' actions are *ultra vires*, and (2) where the officer's actions, though within his official authority, are claimed to be unconstitutional."

The plaintiffs expressly allege that the defendant U.S. Marshals were acting unconstitutionally. Accordingly, under the Sixth Circuit's interpretation of *Larson*, sovereign immunity does not bar the plaintiffs' official capacity claims for injunctive or declaratory relief against the U.S. Marshals in their official capacities.

The defendants raise other challenges to the plaintiffs' claims for injunctive relief under the Supreme Court's decision in *Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983), and the Sixth Circuit's decision in *Blakely v. United States*, 276 F.3d, 853, 873 (6th Cir. 2002). *Lyons* involved the requirement of a plaintiff to state an "actual case or controversy" in a claim for injunctive relief, noting that a plaintiff "must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"

461 U.S. at 102. Under *Lyons*, past injuries are evidence that bears on the likelihood of future injury but are not, by themselves, sufficient. *Id*. at 102-03.

Similarly, in *Blakely*, the Sixth Circuit noted that, "[w]hen seeking injunctive relief, a plaintiff 'must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.'" 276 F.3d at 873 (quoting *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)). Citing *Lyons*, the Sixth Circuit explained that, "while past illegal conduct might constitute" relevant evidence of "whether there is a real and immediate threat of repeated injury, where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief." *Id*. (internal quotations omitted).

The plaintiffs, appearing to have conceded this point, have not alleged that any real threat exists that Mrs. Milligan will, a second time, be falsely arrested due to mistaken identity. Of course, Mrs. Milligan did not expect to be arrested the first time. Nevertheless, under Lyons, in order to have standing, a plaintiff must come forward with a threat of injury that is "real and apparent." 461 U.S. at 102. Accordingly, summary judgment must be granted on the plaintiff's claims for injunctive relief as to the defendant U.S. Marshals in their official capacities.

## IV. Individual Capacity Claims for Injunctive or Declarative Relief

Finally, the plaintiff has alleged claims for injunctive or declarative relief against the known and unknown U.S. Marshals in their individual capacities. The Sixth Circuit has held that, "[j]ust as a plaintiff cannot sue a defendant in his official capacity for money damages, a plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.*, his official capacity." *Community Mental Health Services of Belmont v. Mental Health and Recovery Board Serving*

29

*Belmont, Harrison & Monroe Counties*, 150 Fed. Appx. 389, 401 (6th Cir. 2005).

In *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989), the Seventh Circuit explained the issue of seeking equitable relief through individual capacity claims. In that case, the plaintiff sought relief from the defendants in their individual capacities, while the policy he challenged was "that of the Forest Service and [was] carried out by the defendants in their capacities as supervisory Forest Service employees, i.e., in their official capacities." *Id.* For that reason, the equitable relief that the plaintiff sought could be "obtained only from the defendants in their official capacities, not as private individuals." *Id.* (citing *Del Raine v. Carlson*, 826 F.2d 698, 703 (7th Cir. 1987)).

As in *Feit*, the policy that the plaintiffs are challenging is that of the United States Marshals Service, and it was implemented by the defendant U.S. Marshals pursuant to their official job capacities. Moreover, any injunctive or declaratory relief could be obtained only from the defendant U.S. Marshals in their official capacities. Accordingly, the defendant U.S. Marshals, in their individual capacities, are improperly named in any claim for injunctive or declarative relief.

## V.     Motion to Delay Consideration

As discussed above, the plaintiffs have conceded the federal defendants' arguments for dismissal except for the qualified immunity defense. Moreover, the conceded arguments do not involve issues of fact but, instead, rely solely on the application of clearly established law to the plaintiffs' claims. Accordingly, the plaintiffs' motion to delay consideration to obtain discovery only applies to discovery that would be used to demonstrate that the qualified immunity defense does not apply to the individual federal defendants. Because the court is denying summary

30

judgment as to that defense, the plaintiff's motion to delay consideration is moot.  In addition, the court notes that, due to the nature of the qualified immunity defense, there is no basis for delaying consideration of that defense pending discovery.

> Rule 56(f) of the Federal Rules of Civil Procedure provides that:
>
> If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) deny the motion;
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> (3) issue any other just order.

Fed. R. Civ. Pro. 56(f).  As the Sixth Circuit has explained, "[t]o avoid imposing needless discovery costs upon government officials, the determination of qualified immunity must be made at an early stage in the litigation."  *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir. 2002).  That is because "'[q]ualified immunity is *an immunity from suit* rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial.'"  *Marvin*, 2007 WL 4232968 at *7 (emphasis in original) (quoting *Scott v. Harris*, --- U.S. ----, ----, 127 S.Ct. 1769, 1774 n. 2 (2007)); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In *Skousen*, 305 F.3d at 527, the Sixth Circuit reversed a district court's order holding a motion for summary judgment in abeyance until the completion of discovery, finding that, "[r]ather than dismiss the motion because discovery was not complete, the district court was required to determine—prior to permitting further discovery—whether [the] complaint alleged the violation of a constitutional right at all, and if so, whether that right was clearly established at the time of the alleged violation."  Next, "the court should have turned to the question of whether

any facts material to [the plaintiff's claims] were genuinely at issue," which required "the court to review the motion and its supporting documents as well as the plaintiff's opposition and its supporting documents." *Id*. Only after these steps had been taken could the plaintiff gain access to additional discovery. *Id*.; *see also Summers v. Leis*, 368 F.3d at 886 ("[B]ecause the defense of qualified immunity is a threshold question, if the defense is properly raised prior to discovery, the district court has a duty to address it.").

In the case at hand, the plaintiffs submit that additional discovery is required for several specific reasons. The plaintiffs point to the fact that all of the affidavits relied upon by the defendants are from interested parties, that a number of documents, including the actual warrants at issue, have not been produced by the defendants, and that the plaintiffs would like to question the defendants about a number of other documents, including the spreadsheet that the arresting officers consulted and other documents that were in the arrest file. In a normal case, these issues would be sufficient for holding the motion in abeyance pending discovery. However, because the only factual issues to be decided by the court on this motion relate to the qualified immunity defense, the court is foreclosed by the Sixth Circuit precedent from delaying its analysis of those issues. *See Summers*, 368 F.3d at 886. Even if the plaintiff's motion to delay consideration were not moot, the court, as a matter of law, could not grant that motion. These matters will be explored in the normal course of discovery, which will begin after the court conducts the initial case management conference.

## **CONCLUSION**

For the reasons stated herein, the plaintiffs' Motion to Delay Consideration will be denied and the defendants' Motion for Summary Judgment will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge