# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PAULA ANN MILLIGAN, and )
HAROLD MONTGOMERY )
MILLIGAN, )
     )
     Plaintiffs, )      **Case No. 3:07-1053**
     )      **Judge Trauger**
v. )
     )
THE UNITED STATES OF AMERICA, )
et al., )
     )
     Defendants. )

## MEMORANDUM

Defendants Wesley Terry, Craig Reese, and Unknown U.S. Marshals[1] ("the federal

defendants"), have filed a Motion for Reconsideration (Docket No. 91), to which the plaintiffs

have responded (Docket No. 95)[2]. For the reasons discussed herein, the federal defendants'

motion will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Paula Ann Milligan was arrested by four United States Marshals and two Metro

Nashville Police officers on October 24, 2006, under "Operation Falcon III". The defendants

admit that, in arresting the plaintiff, they arrested the wrong person.

---

[1]In their Amended Complaint, the plaintiffs identified two of these Marshals as Deputy
Marshals Kevin Koback and Daniel Thomas Shelton. (*See* "Motion to Amend Complaint,"
Docket No. 62) In the court's May 2, 2008 Order, all claims against Mr. Koback were dismissed
in their entirety. (Docket No. 85)

[2]In conjunction with their response, the plaintiffs have requested oral argument. (Docket
No. 95) That request will be denied as moot.

1

The woman who should have been arrested was named Paula Milligan, a.k.a., Rebecca Stapps, and was wanted on charges of forgery and identity theft. The parties have not produced any of the four arrest warrants for Paula Milligan, a.k.a., Rebecca Stapps, to the plaintiffs in discovery nor produced those warrants to the court as a part of their defense. However, the plaintiffs have produced the original complaint, indictment, and capias for Ms. Milligan a.k.a. Stapps. These documents identify a 5' 3'', 24-year-old, white female with brown hair and blue eyes, a North Carolina driver's license, and an address in Goldsboro, North Carolina. The plaintiff, in contrast, is a 5'6'', 42-year-old, white female with blond hair and brown eyes, a Tennessee driver's license, and an address in Antioch, Tennessee.

In arresting the plaintiff, the federal defendants relied on an arrest file created in conjunction with the Tennessee Bureau of Investigation ("TBI"). TBI constructed the file from information contained in a spreadsheet that was created by the Metropolitan-Nashville Police Department ("Metro"). Defendant Kevin Koback, a Deputy U.S. Marshal, received this spreadsheet from Metro via email. The spreadsheet listed the names of 1300 persons with outstanding warrants, including a person with the name "Milligan" and plaintiff Paula Ann Milligan's date of birth and Tennessee driver's license number. The spreadsheet did not list Ms. Milligan's correct address, but instead included a Goldsboro, North Carolina address.

Mr. Koback sent the spreadsheet to an individual working with the Tennessee Bureau of Investigation, who performed identifying information searches through various databases, ultimately finding the plaintiff's name and identifying information, and linking it with the outstanding warrants referenced on the spreadsheet. (Docket No. 47 at p. 3). This information was placed into an arrest file. In addition, the Tennessee Bureau of Investigation performed a

2

criminal record check that revealed that the plaintiff had no criminal record on the national crime database, no outstanding warrants, and no local warrants. This information was also placed in the arrest file. A worksheet was placed in the file, including a box that asked whether or not the warrant for the individual in question had been "confirmed." This box was left blank, and next to this box, a "No" was circled.[3]

In their memorandum in support of their motion for summary judgment, the federal defendants alleged that "[t]he law enforcement officers participating in Operation Falcon III had in their possession a warrant for the arrest of Paula Milligan, and identifying information that squared completely with the plaintiff Paula Milligan, including a color photograph of her." (Docket No. 45 at p. 17) However, in their memorandum in support of their motion for reconsideration, the federal defendants have alleged that "this was an erroneous statement," and that "[t]he officers did not have the arrest warrant for the arrest of Paula Milligan in their possession at the time of her arrest." (Docket No. 91 at p. 2, n.1)

On the morning of October 24, 2006, the defendants arrived at the plaintiffs' home and demanded entry. Plaintiff Monty Milligan was talking on the phone with his wife, who was away from home, dropping the couple's four-year-old daughter off at day care. The officers demanded to speak with Mrs. Milligan. A U.S. Marshall took the phone and told Mrs. Milligan to come home right away or else risk being arrested at her place of employment. Mrs. Milligan

---

[3]The worksheet, titled "Fugitive Work Up Fact Sheet" (Docket No. 57 at p. 1), included, on the third line, a section titled "NCIC III Criminal History-FBI #, CRU, SORT, STOP:" which was left blank. Next to this box, a "No" was circled. On the fourth line, the sheet included a section titled "Outst. Warrant-NCIC, TRAP, local warrants:" which was also left blank. Next to this box, another "No" was circled. And next to that "No" there was a box labeled "Hit Sheet Attached, Warrant Confirmed, Extradition Confirmed," which was left blank.

drove home.

While she was en route, the officers searched the plaintiffs' home. Then the officers left the Milligans' living room and went outside, planning to make the arrest in the front yard. At approximately 8:24 a.m., Mrs. Milligan arrived home and was told by a male officer that she was being arrested for multiple counts of forgery. Mrs. Milligan stated, "Obviously there has been some mistake here." (Docket No. 73 at p. 13-14) An officer wearing a Metro police uniform replied, "Well, often that is the case; there are times when it is just a big mistake." (*Id*. at 14)

The officers told Mrs. Milligan that they would wait until she was inside the police car to handcuff her but, soon afterwards, a cameraman arrived. An officer handcuffed Mrs. Milligan outside of the car and the act was caught on film. Mrs. Milligan was crying hysterically. The officers placed Mrs. Milligan in the patrol car and they drove off. Mrs. Milligan protested that the officers were arresting the wrong person. The officers asked Mrs. Milligan if she had ever lived in North Carlina. Mrs. Milligan answered, "No."

Mrs. Milligan was taken to LP Field, where she was transferred into the custody of other government officials. She remained outdoors and in handcuffs for an extended period. Mrs. Milligan was eventually transported to an underground parking lot or garage where she was placed inside a cage. Over the next few hours, Mrs. Milligan was moved from the cage and a man, who identified himself as a nurse, drew her blood without her permission. Next, Mrs. Milligan was handcuffed to a long chain with several other prisoners and walked, along with these prisoners, from one building to another, where Mrs. Milligan's fingerprints were taken.

Later, Mrs. Milligan was held at a jail operated by the City of Nashville, Tennessee, until her husband was able to post bond, approximately six or seven hours after her arrest. Defendant

4

Sinclair Television broadcasted Mrs. Milligan's arrest as a part of a nationally publicized, multi-state round up of "the worst of the worst." (Docket No. 76 at p. 14) On November 1, 2006, the criminal charges against Mrs. Milligan were dismissed by the Criminal Court for Davidson County, Tennessee, finding that Mrs. Milligan was "not the correct person for whom the Indictment and Capias were issued" and that she "was mistakenly arrested, charged, booked and jailed by United States, State and local law enforcement officers." (Docket No. 73, Ex. at p. 2)

On October 23, 2007, plaintiffs Paula Ann Milligan and Harold Montgomery Milligan filed this action, alleging: (1) violations of Mrs. Milligan's constitutional rights for being falsely arrested against both federal and municipal defendants; (2) violations of both plaintiffs' constitutional rights for being subjected to unconstitutional searches, against both federal and municipal defendants; (3) a *Monell* pattern and practice claim for unconstitutional polices, practices, and/or customs against the United States Marshals Service and the Metropolitan Police Department; (4) the tort of false light against all defendants; and (5) the tort of libel against all defendants. (Docket No. 1) On April 1, 2008, the plaintiffs filed a First Amended Complaint, alleging the same causes of action. (Docket No. 76)

On January 18, 2008, defendants United States of America, United States Marshals Service, Wesley Terry, Craig Reese, and the four Unknown U.S. Marshalls (two of whom were subsequently identified as Deputy Marshals Kevin Koback and Daniel Thomas Shelton) moved to dismiss all counts against them (Docket No. 44), and on February 11, 2008, the court notified the parties that it would treat that motion to dismiss as a motion for summary judgment. (Docket No. 64) On February 25, 2008, the plaintiffs moved to delay consideration of the motion for summary judgment under Rule 56(f) of the Federal Rules of Civil Procedure. (Docket No. 65)

On May 2, 2008, the court denied the plaintiffs' motion to delay consideration, and granted in part and denied in part the federal defendants' motion for summary judgment. (Docket No. 85) Specifically, the court dismissed all claims against defendants United States of America and United States Marshals Service as well as all claims against the U.S. Marshalls, known and unknown, in their official capacities, and all claims against defendant Kevin Koback. In addition, the court dismissed all claims against the remaining U.S. Marshalls in their individual capacities for declaratory or injunctive relief and all claims for monetary relief against Defendant Thomas Shelton arising from the search of the plaintiff's home (though not the claims arising from the arrest itself). The remaining claims against defendants Wesley Terry, Craig Reese, and Thomas Shelton and other unknown U.S. Marshalls in their individual capacities, brought under *Bivens v. Six Unknown Named Agents of the Bureau of Narcotics*, 403 U.S. 388 (1971), were designated to proceed to trial.

## ANALYSIS

**I.     Standard of Review**

The federal defendants do not state the procedural basis for their motion to reconsider; however, such motions can be filed under either Rule 59(e) or Rule 60 of the Federal Rules of Civil Procedure. Rule 59(e) merely provides that "[a] motion to alter or amend a judgment shall be served no later than 10 days after entry of the judgment." Fed. R. Civ. P. 59(e). The Sixth Circuit has held that "[a] motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e) may be granted (1) to correct a clear error of law; (2) to account for newly discovered evidence or an intervening change in the controlling law; or (3) to otherwise prevent manifest injustice." *CGH Transport, Inc. v. Quebecor World, Inc.*, No. 06-6399, 2008 WL

6

116385 at *5 (6th Cir. Jan. 8, 2008) (citing *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)). Any "'newly discovered evidence' . . . must have been previously unavailable." *GenCorp.*, 178 F.3d at 834 (citing Charles A. Wright, 11 *Federal Practice and Procedure* § 2810.1 at 127-28 (1995)). In addition, "under Rule 59(e), parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued." *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 395 (6th Cir. 2007) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) ("A motion under Rule 59(e) is not an opportunity to re-argue a case.")).

The standard "for granting a Rule 60(b) motion is significantly higher than the standard applicable to a Rule 59 motion." *Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 268 (6th Cir. 1998)). Rule 60 provides that, "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b).

Presumably the basis for the federal defendants' motion is that the court's May 2, 2008 memorandum was in clear error of law; the defendant has identified no other basis for reconsideration, but instead reiterates its position, which the court has already rejected, that the

7

remaining federal defendants are entitled to qualified immunity.[4]

## II.    Qualified Immunity

Government officials performing discretionary functions pursuant to their employment "are shielded from liability through 'qualified immunity' if they violate an individual's constitutional rights," but the rights were not "'clearly established' at the time" they were violated. *Marvin v. Taylor*, --- F.3d ----, 2007 WL 4232968 at *7 (6th Cir. Dec. 4, 2007) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The defense "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphry v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Harlow*, 457 U.S. at 818); *see also Smoak v. Hall*, 460 U.S. F.3d 768, 777 (6th Cir. 2006).

### A.    Whether The Allegations Establish A Constitutional Violation

The threshold question requires the court to consider, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If "no constitutional right would have been

---

[4]The federal defendants have attached two new affidavits to their motion, but have made no showing that these affidavits include newly discovered evidence. Accordingly, the affidavits will not be considered. Newly discovered evidence must have been "previously unavailable," *see GenCorp*, 178 F.3d at 834, and it is "'well-established . . . that a district court does not abuse its discretion in denying a Rule 59 motion when it is premised on evidence that the party had in his control prior to the entry of judgment.'" *General Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434, 445 (quoting *Emmons v. McLaughlin*, 874 F.2d 351, 358 (6th Cir. 1989)); *see also Al-Sadoon v. FISI Madison Financial Corp.*, 188 F. Supp. 2d 899, 903 (declining to consider evidence on a motion to reconsider because "none of [it] [was] newly discovered and all of it was available to the defendant when it filed its previous motion for summary judgment"); *Scott v. Metropolitan Health Corp., 234 Fed. Appx. 341*, 366 (6th Cir. 2007) ("As with other rules of civil and criminal procedure, Rule 59(e)'s new-evidence prong required [plaintiff] to show that due diligence would not have uncovered this evidence . . . .").

violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* Of course, if the allegations support "no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity." *Marvin*, 2007 WL 4232968 at \*8 (citing *Scott*, 127 S.Ct. at 1779).

In the present case, construing the facts alleged in the light most favorable to the plaintiff, as the court must, two constitutional violations occurred: first, Mrs. Milligan's arrest constituted an unlawful seizure in violation of the Fourth Amendment and, second, the search of the Milligan home constituted an unlawful search in violation of the Fourth Amendment.

### 1.    The Arrest

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A "seizure" of an individual takes place when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." *Ingram v. City of Columbus*, 185 F.3d 579, 595 (6th Cir. 1999). The Sixth Circuit has explained that, "[w]here the police have probable cause to arrest one party but reasonably mistake a second party for the first, their arrest of the second party is valid." *Ingram*, 185 F.3d at 595 (6th Cir. 1999) However, this mistake must be reasonable. While "'room must be allowed for some mistakes' in officers' determinations of probable cause, 'the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.'" *Ingram*,

9

185 F.3d at 596 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

As a general rule, where police officers rely on a facially valid warrant—and where that reliance is reasonable—no constitutional violation has occurred. *See Hill v. California*, 401 U.S. 797, 803-04 (1971); *Jackson v. Holyman*, 12 F.3d 212, 1993 WL 50159 at *3 (6th Cir. 1993) (unpublished) ("[P]olice . . . may rely on facially valid arrest warrants even in the face of vehement claims of innocence by reason of mistaken identity or otherwise.") (quoting *Masters v. Crouch*, 872 F.2d 1248, 1253 (6th Cir. 1989)). However, that reliance must be reasonable, and where the warrant is clearly made out for a person other than the one who was arrested, or where there is a question as to the warrant's validity itself, an arrest can violate the Fourth Amendment. *See Brown v. Byer*, 870 F.2d 975, 979 (5th Cir. 1989) ("The existence of a facially valid warrant for the arrest of one person does not authorize a police officer to effect the arrest of another person, even if the officer believes the second person guilty of the first person's crimes and even if the two people have similar names.").

Although a mistaken-identity arrest based purely on probable cause, and without a warrant, has been found to be constitutional, *see Hill v. California*, 401 U.S. at 802, the hallmark of constitutionality in such cases is reasonableness. In *Hill*, the Supreme Court addressed a case where the police, without an arrest warrant but with probable cause to arrest a suspect named Hill, arrested a man named Miller instead, because he fit Hill's description and answered the door at Hill's address. The case arose not on a cause of action brought by the wrongfully arrested Miller, but instead on a motion to exclude evidence that was obtained pursuant to the arrest. *Id*. at 802. The Court held that the arrest had not violated the Fourth Amendment, finding that "the police had probable cause to arrest Hill and that the arresting officers had a reasonable,

10

good faith belief that the arrestee Miller was in fact Hill." *Id*. at 803. This finding was based on the fact that Miller fit Hill's description, was inside the apartment, which was locked, and that Miller's explanation for his mode of entry was not convincing. *Id*.

Subsequent courts have cited *Hill* for the proposition that, although reasonable mistakes can be made in ascertaining the correct identity of an arrestee without implicating the Fourth Amendment, where questions of fact exist as to the reasonableness of the mistake, summary judgment should not be granted. *See Ingram*, 185 F.3d at 592-93. In *Ingram*, a suspect fled into a home after offering to sell police officers narcotics; the police officers entered the home and arrested another man with a different complexion, who had been napping in the basement of the home. *Id*. at 596. The court found that genuine issues of fact existed as to the reasonableness of the arrest. *Id*.; *see also Lee v. Gregory*, 363 F.3d 931, 935 (9th Cir. 2004) ("Knowingly arresting the wrong man pursuant to a facially valid warrant issued for someone else violates rights guaranteed by the Fourth Amendment.").

In *Berg v. County of Allegheny*, 219 F.3d 261, 266-67 (3d Cir. 2000), the Third Circuit addressed a situation where a warrant clerk mistakenly transposed two numbers in the criminal complaint number for a fugitive, resulting in the wrong name appearing on the warrant. Noticing that the name, when entered into the criminal database, called up different personal information, a peace officer changed the information on the warrant to match. *Id*. The result was the mistaken arrest of the plaintiff. *Id*. The court found that the plaintiff's case against the arresting officer should survive summary judgment, reasoning that "an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the circumstances." *Id*. at 273. The court stated that "[s]uch circumstances include, but are not

11

limited to, other information that the officer possesses or to which he has reasonable access, and whether failing to make an immediate arrest creates a public threat or danger of flight." *Id*.

The federal defendants arrested an individual who, as in *Ingram*, shared very few physical characteristics with the fugitive for whom probable cause to arrest actually existed, relying, as in *Berg*, on data that had been somehow incorrectly gathered. Because the warrants have not been produced, their contents remain an open factual question. However, the capias and the indictment provide strong evidence that the warrants contraindicated the plaintiff. Accordingly, under *Ingram* and *Berg*, there is at least a factual dispute as to the reasonableness of the arrest.

Conceding that the information in the arrest file on which the officers relied was erroneous, and that those officers did not consult the warrants themselves, the federal defendants, in the present motion, allege that they did not violate the Fourth Amendment in arresting Mrs. Milligan because they relied on information given to them by other law enforcement entities. In support of this argument, the federal defendants have cited cases for the proposition that arresting officers do not have to maintain physical possession of an arrest warrant in order to make a valid arrest. *See United States v. Buckner*, 717 F.2d 297, 301 (6th Cir. 1983); *United States v. Leftwich*, 461 F.2d 586, 592 (3d Cir. 1972); *Gill v. United States*, 421 F.2d 1353, 1355 (5th Cir. 1970); *United States v. Salliey*, 360 F.2d 699, 704 (4th Cir. 1966); *Bartlett v. United States*, 232 F.2d 135, 138 (5th Cir. 1956); *Bowers v. Coiner*, 309 F. Supp. 1064, 1069 (S.D. W. Va. 1970). However, none of these cases involved defective warrants or warrants that failed to identify the person who was arrested. *See United States v. Buckner*, 717 F.2d at 301 (holding that where the police "did have reliable knowledge of a state bench warrant" whose validity was

not challenged, the arrest was valid).  That is, each of the above cases simply involved an arrest on a valid warrant where the arresting officer did not have that warrant on his person during the arrest.  *See United States v. Leftwich*, 461 F.2d at 592 ("While it is true that the arresting agents did not have the warrant with them at the time of arrest, they were not required to have it in their possession if it was outstanding at that time.")  The cases hold that such arrests are valid, and do not give rise to the exclusionary rule.  *See Gill v. United States*, 421 F.2d at 1355 (5th Cir. 1970) ("Under the circumstances the arrest was proper even though the arresting officer did not have the actual written warrant in hand.")  The cases do not address the issue raised in this case, where an arrest was made based on documentation that proved to be false, and where the warrants—according to what little evidence we have—most likely described a person much different from the plaintiff.  Such cases do exist.

In *Whitley v. Warden*, 401 U.S. 560, 568, the Supreme Court explained that:

> Certainly police officers called upon to aid other officers in executing warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.  *Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.*

(emphasis added); *see also United States v. Hensley*, 469 U.S. 221, 232 ("[I]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.")  *Whitley* involved the application of the exclusionary rule to information gathered from an arrest made in reliance on information—later proven to be incorrect—that an outstanding warrant existed.  401 U.S. at 565.  Accordingly, although the rule in *Whitley* does not end the analysis for purposes of qualified immunity—it does not analyze the "clearly established" element—it does define the Fourth Amendment right at issue when an arrest

13

is made on false information provided by other officers. Under *Whitely*, an officer may rely on information provided by other officers in making an arrest; however, where that information is false, a Fourth Amendment violation has occurred. *Id.*; *see also United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002) ("[A] finding of reasonable suspicion to justify the stop required the presentation of evidence . . . that the officer who issued the radio bulletin had reasonable suspicion, not simply that it was reasonable for the arresting officer to have relied on the bulletin.").

In *Hensley*, the Supreme Court made this point even more clear. The Court held that, although the reasonableness of the officers' reliance on the relayed information is relevant to the second stage of the qualified immunity inquiry, when defining whether or not a violation occurred at all, the issue is whether the officers who issued the information had probable cause to make the arrest. 469 U.S. at 231; *see also Rogers v. Powell*, 120 F.3d 446, 454 (3d Cir. 1997) (holding that, although the reasonableness of the officers' reliance would be relevant to the second part of the inquiry, the preliminary question is "did the officer making the statements . . . have knowledge of facts and circumstances sufficient to warrant a conclusion of probable cause?").

In the case at hand, the federal defendants concede that the information in the arrest file was erroneous. Accordingly, the preliminary question is whether the individuals who compiled that arrest file had facts and circumstances sufficient to warrant a conclusion of probable cause. Under *Ingram* and *Berg*, that question depends in large part on the information in the arrest warrants themselves, which the court does not have. There are sufficient facts in the record, however, to create at least a factual dispute as to whether the warrants could support a reasonable, good faith belief that Mrs. Milligan was the person to be arrested. The original complaint,

14

indictment and capias identify a 5' 3'', 24-year-old, white female with brown hair and blue eyes, a North Carolina driver's license, and an address in Goldsboro, North Carolina. The plaintiff, in contrast, is a 5'6'', 42-year-old, white female with blond hair and brown eyes, a Tennessee driver's license, and an address in Antioch, Tennessee.

Moreover, and most importantly, there was information in the arrest file itself that indicated Mrs. Milligan was not the person to be arrested. Specifically, the arrest file contained criminal search histories indicating that no outstanding warrants existed for Mrs. Milligan. Mrs. Milligan's name, social security number, and date of birth were entered into Tennessee Criminal History and NCIC databases, the result of which was "no matching records." (Docket No. 57, p. 4-6) Perhaps for this reason, the "Fugitive Work Up Fact Sheet" included in the arrest file did not show that the warrant had been confirmed, or that any outstanding warrants had been located, although boxes were specifically designated for entering that information. (Docket No. 57 at p. 1) Viewing these factual issues in a light most favorable to the plaintiff, the arrest constituted a Fourth Amendment violation. The court was not in error of law in so holding in its May 2, 2008 memorandum.

### 2. The Search

In addition, the plaintiffs properly alleged a constitutional violation as to the search of their home. The search was not undertaken pursuant to a valid search warrant. A "search of the house or office is generally not reasonable without a warrant issued on probable cause;" however, there are contexts "where the public interest is such that neither a warrant nor probable cause is required." *Maryland v. Buie*, 494 U.S. 325, 332 (1990). For instance, the Sixth Circuit has recognized that, "[d]uring a search incident to an arrest occurring inside a home, officers may 'as

15

a precautionary matter and without probable cause or a reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) (quoting *Maryland v. Buie* 494 U.S. at 334). In addition "officers may conduct a search more pervasive in scope when they have 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* (quoting *Buie*, 494 U.S. at 334).

The officers did not make an in-house arrest; instead, they chose to arrest Mrs. Milligan outside, in view of television cameras. The Sixth Circuit has not adopted a bright-line rule that a protective search is never justified when the arrest occurs outside the home; however, the Sixth Circuit has held that, "where a defendant is arrested outside a home, 'a warrantless search of the apartment could be justified only if the officers had a specific, reasonable basis for believing . . . that they were in danger from persons inside . . . .'" *Id.* (quoting *United States v. Calhoun*, 49 F.3d 231, 234 n.3 (6th Cir. 1995)). Accordingly, "in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers," and "the fact that the arrest takes place outside rather than inside the home affects only the inquiry into whether the officers have a reasonable articulable suspicion that a protective sweep is necessary by reason of a safety threat." *Id.* (citing *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995)).

Under *Colbert*, the perceived dangerousness of the individual to be arrested is "irrelevant to the inquiry into whether the police had a reasonable suspicion of danger." 76 F.3d at 777. Instead, "[t]he facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the

dangerousness of the arrested individual." *Id*. The Court further explained that, "[i]f district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep." *Id*.; *see also United States v. Edgerson*, 243 Fed. Appx. 974, 975 (6th Cir. 2007) ("A protective sweep of a residence, conducted after an arrest has been made outside the residence, is justified only if the officers can demonstrate an articulable basis for their reasonable belief that *someone else inside the house* might pose a danger to them.") (internal quotations omitted) (emphasis in original); *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) (although "there could always be a dangerous person concealed within a structure. . . . that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*").

The plaintiffs presented, by affidavit of Mr. Milligan, testimony that the arresting officers searched the plaintiffs' home *before* they went outside to arrest Mrs. Milligan. The defendants have articulated no reason to believe, in this situation, that some other dangerous person occupied the house. Accordingly, the plaintiffs alleged a constitutional violation for an unreasonable search under the Fourth Amendment. The court was not in error of law in so holding in its May 2, 2008 memorandum.

###　　B.　　Whether The Constitutional Violation Was Clearly Established

In *Saucier*, the Supreme Court explained that "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more

17

particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In performing this analysis, the court "must look first to decisions of the Supreme Court, then to the decisions of [the Sixth Circuit Court of Appeals] . . . and finally to decisions of other circuits." *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). That a violation was clearly established "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, U.S. 730 (2002)).

### 1. The Arrest

With regard to the arrest, the question is whether a reasonable officer would have understood that arresting Mrs. Milligan under the circumstances violated her constitutional rights. This is an objective issue, and has been put the following way: "whether a reasonable officer in [the defendants'] position could believe that there was a reasonable cause to believe that [the plaintiff] was the person named on the warrant." *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir. 1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("The relevant question in this case . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.").

Assuming, as the federal defendants presently allege, that the arresting officers did not view the warrants and instead relied on information provided to them by others, the question is whether or not that reliance was reasonable. *Hensley*, 469 U.S. at 232-33. It is not enough that

18

they relied on other officers; that reliance must have been reasonable.[5]  Under *Hensley*, this

question "depends on an objective reading" of the information provided to the officers.  *Id*. at

234; *see also Rogers v. Powell*, 120 F.3d 446, 455 ("[A]n officer will be entitled to qualified

immunity from liability in a civil rights suit for unlawful arrest provided it was objectively

reasonable for him to believe, on the basis of the statements, that probable cause for the arrest

existed.")

     An objective reading of the arrest file reveals that the officers' reliance on that file, and

their failure to check on the warrants themselves, was unreasonable.  As explained above, the

arrest file contained criminal search histories indicating that no outstanding warrants existed for

Mrs. Milligan.  Mrs. Milligan's name, social security number, and date of birth were entered into

Tennessee Criminal History and NCIC databases, the result of which was "no matching records."

(Docket No. 57, p. 4-6)  This information should have alerted the arresting officers to the fact that

Mrs. Milligan was not the correct person to be arrested.

     In addition, the file included a "Fugitive Work Up Fact Sheet"  (Docket No. 57 at p. 1)

The "Fugitive Work Up Fact Sheet" included, on the third line, a section titled "NCIC III

Criminal History-FBI #, CRU, SORT, STOP:" which was left blank.  Next to this box, a "No"

was circled.  On the fourth line, the sheet included a section titled "Outst. Warrant-NCIC, TRAP,

local warrants:" which was also left blank.  Next to this box, another "No" was circled.  And, next

to that "No," there was a box labeled "Hit Sheet Attached, Warrant Confirmed, Extradition

---

[5]In fact, even where officers do rely on the warrants themselves, "an apparently valid
warrant does not render an officer immune from suit if his reliance on it is unreasonable in light
of the relevant circumstances."  *Berg*, 219 F.3d at 273.  These circumstances include "other
information that the officer possesses or to which he has reasonable access, and whether failing
to make an immediate arrest creates a public threat or danger of flight."  *Id*.

Confirmed," which was left blank. The "Fact Sheet," viewed objectively, creates at least a question as to whether or not the warrants were confirmed. Combined with the attached criminal search histories, the sheet indicates that no outstanding arrest warrants existed for Mrs. Milligan. Accordingly, the file itself should have alerted the arresting officers that Mrs. Milligan was not the right person to arrest. Especially given the fact that Operation Falcon III was planned out far in advance and did not involve an emergency, there is sufficient factual evidence that reliance on this file was unreasonable. The court was not in error in so holding in its May 2, 2008 memorandum.

## 2. The Search

Protective sweeps of a home that are undertaken even though the defendant is arrested outside the home are prohibited, unless there are facts "giving rise to a suspicion of danger from attack by a third party during the arrest" and cannot be justified by "the dangerousness of the arrested individual." *Colbert*, 76 F.3d at 777.

The rule announced in *Colbert* has been clearly established in the Sixth Circuit and elsewhere. *See United States v. Pihlblad*, 142 F.3d 437 (Table), 1998 WL 165150 at *3 (6th Cir. 1998) (holding that a search did not "meet the requirements of a protective sweep" because "[t]he government fails to point to a single 'articulable fact' that would have caused the police reasonably to think a dangerous person remained in the house after [the defendant] was arrested outside"); *United States v. Winston*, 444 F.3d 115, 125 (1st Cir. 2006) ("Every one of our own cases addressing the propriety of a protective sweep has turned on the searching officers' suspicion, *vel non*, based on some affirmative evidence, that a particular and identifiable individual . . . remained in the building that was searched."); *United States v. Gandia*, 424 F.3d

Case 3:07-cv-01053   Document 96   Filed 05/30/08   Page 20 of 21 PageID #: 656

255, 264 (2d Cir. 2005) ("Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties."); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) ("[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case.")

The defendants proffered no justification for the search other than the perceived dangerousness of Mrs. Milligan. Under *Colbert* and the other cases cited above, that suspicion of danger simply cannot justify a warrantless search of a home at all, let alone *before* the arrest is ever even made. The plaintiffs met their burden, on summary judgment, to show that a reasonable officer would have understood that this search violated the Milligans' constitutional rights. The court was not in error in so holding in its May 2, 2008 memorandum.

## CONCLUSION

For the reasons stated herein, the defendants' Motion for Reconsideration will be denied. An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge