**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PAULA ANN MILLIGAN and** | ) | |
| **HAROLD MONTGOMERY MILLIGAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:07-1053** |
| | ) | **Judge Trauger** |
| **UNITED STATES OF AMERICA, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**CONSOLIDATED WITH**

| | | |
|---|---|---|
| **PAULA ANN MILLIGAN and** | ) | |
| **HAROLD MONTGOMERY MILLIGAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08-0380** |
| | ) | **Judge Trauger** |
| **METROPOLITAN GOVERNMENT OF** | ) | |
| **NASHVILLE AND DAVIDSON COUNTY,** | ) | |
| **_et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM</u>**

Pending before the court is the motion for summary judgment filed by the defendant

Sinclair Television of Nashville, Inc. (Docket No. 155), to which the plaintiffs have responded

(Docket No. 166), and the defendant Sinclair Television of Nashville, Inc. has replied (Docket

No. 178). Also pending is the motion for summary judgment filed by the defendant

Metropolitan Government of Nashville and Davidson County (Docket No. 167), to which the

plaintiffs have responded[1] (Docket No. 181), and the defendant Metropolitan Government of Nashville and Davidson County has replied (Docket No. 182). For the reasons discussed herein, the motion for summary judgment filed by the defendant Sinclair Television of Nashville, Inc. will be granted, and the motion for summary judgment filed by the defendant Metropolitan Government of Nashville and Davidson County will be granted in part and denied in part.

As a housekeeping matter, also still pending is the plaintiffs' motion to amend the complaints in this matter (Docket No. 139), to which certain of the defendants have responded (Docket Nos. 140, 145, & 146), and the plaintiffs have replied (Docket No. 148). In an order dated April 30, 2009, however, the court addressed the objections raised in the responses, striking aspects of the plaintiffs' proposed second amended complaint in Case No. 3:08-0380. (Docket No. 159.) Thus, the plaintiffs' motion to amend will be granted, except with respect to those matters stricken in accordance with the court's April 30, 2009 Order.

## BACKGROUND

In late October 2006, the U.S. Marshals Service, in conjunction with local law enforcement officials across the country, including those employed by the Metropolitan Government of Nashville and Davidson County ("Metro"), conducted "Operation Falcon III," a "fugitive round-up" that resulted in the arrest of more than ten thousand individuals.[2]

---

[1]The federal defendants have also filed a response, although this response does not take any position on the legal arguments but merely attempts to clarify the other parties' characterizations of certain deposition testimony. (Docket No. 179.)

[2]Unless otherwise noted, the facts have been drawn from the Plaintiffs' Response to Sinclair's Statement of Undisputed Facts in Support of Motion for Summary Judgment (Docket No. 164), Plaintiffs' Response to Statement of Material Facts Not in Dispute Filed by Defendant Metropolitan Government of Nashville and Davidson County in Support of Motion for Summary Judgment (Docket No. 180), and The Metropolitan Government's Response to Plaintiffs'

One of the individuals arrested during Operation Falcon III is one of the plaintiffs in this matter, Paula Ann Milligan, a resident of Antioch, Tennessee.[3]  Mrs. Milligan was arrested on October 26, 2006 pursuant to a capias issued for Paula Milligan, a.k.a. Paula Rebecca Staps.[4]  The defendants fully acknowledge that, in arresting Mrs. Milligan, law enforcement officials arrested the wrong person.  This case grows out of Mrs. Milligan's false arrest and a subsequent news report aired by WZTV-Fox 17 regarding that arrest.

## I.       Mrs. Milligan's Arrest

The process by which the capias for the arrest of Ms. Milligan/Staps led to the arrest of the plaintiff Mrs. Milligan, though largely undisputed, necessitates some review.  On May 26, 2006, the Davidson County Grand Jury returned an indictment against "Paula Milligan, a.k.a. Paula Rebecca Staps," and a capias was issued for that individual, described as a 5' 3" 24-year-old white female with brown hair and blue eyes, a North Carolina driver's license, and an address in Goldsboro, North Carolina.  The plaintiff Mrs. Milligan, in contrast, is a 5' 6" 42-year-

---

Statement of Additional Facts (Docket No. 183), as well as the exhibits, deposition transcripts, and other materials submitted by the parties in support thereof.  Defendant Sinclair Television of Nashville, Inc. has objected to the plaintiffs' response to Sinclair's statement of undisputed facts, arguing that the plaintiffs' responses are "voluminous, argumentative, and elusive" and, thus, do not constitute a response in conformity with the applicable local rule.  (Docket No. 178 at 3-7.)  As such, Sinclair urges that the plaintiffs' response to certain statements be stricken and those statements deemed undisputed.  (*Id.* at 7.)  While the court concurs that a number of the plaintiffs' responses, some of which stretch over more than two single-spaced pages, are excessively argumentative and, in many cases, not responsive to the particular fact stated by Sinclair, the court declines to strike those responses but cautions the plaintiffs against providing such responses in the future.

[3]The other plaintiff is Harold Montgomery Milligan, Mrs. Milligan's husband.

[4]The capias is the document that authorized the arrest of Ms. Milligan/Staps, although the parties appear to use the terms "warrant" and "capias" interchangably.

3

old white female with blond hair and brown eyes, a Tennessee driver's license, and an address in Antioch, Tennessee.

The capias for the arrest of Ms. Milligan/Staps was routed to Nicholas Pride, a data entry clerk in the Warrants Division of the Metro Police Department, who was responsible for entering the information on the capias into the police department's database of outstanding warrants and capiases. As a general matter, in performing this task, Mr. Pride was permitted to use a "Master Name Index" of individuals with prior contacts with the Metro Police Department to obtain specific identifying information about an individual named in a warrant or capias, rather than manually entering all of the identifying information from the warrant or capias into the database. In the process of entering the capias for Ms. Milligan/Staps, Mr. Pride searched the Master Name Index, where he discovered an entry for the plaintiff Mrs. Milligan, stemming from a traffic ticket that Mrs. Milligan had received years previously. However, Mr. Pride apparently failed to cross-reference identifying information between the capias and the Master Name Index, such as a date of birth and driver's license number, which would have made apparent that Ms. Milligan/Staps and the plaintiff Mrs. Milligan were two different individuals. Instead, Mr. Pride linked the capias issued for Ms. Milligan/Staps with the entry in the Master Name Index for the plaintiff Mrs. Milligan, such that the plaintiff Mrs. Milligan's date of birth and Tennessee driver's license number became associated with the capias issued for Ms. Milligan/Staps.

As the U.S. Marshals Service and Metro police prepared for Operation Falcon III, Deputy U.S. Marshal Kevin Koback and Metro Police Sargent Anthony Bourk communicated regarding the list of outstanding warrants and capiases that would be served during the operation. That list was in the form of an Excel spreadsheet, and Sargent Bourk sent Deputy Marshal Koback a

4

number of versions of that spreadsheet. An early version of the spreadsheet that Sargent Bourk sent to Deputy Marshal Koback contained Mrs. Milligan's name with her correct birth date and Tennessee driver's license number, but the North Carolina address of Ms. Milligan/Staps. A later version of the list, sent after Sargent Bourk had "cleaned" the list by removing warrants that would not be served during the operation, did not contain Mrs. Milligan's name, on account of the fact that her name was associated with an out-of-state address. However, Deputy Marshal Koback apparently forwarded the earlier version of the list, containing Mrs. Milligan's name, to the Tennessee Bureau of Investigation ("T.B.I.") so that the T.B.I. could create arrest files containing the paperwork for each arrest that would take place during Operation Falcon III.[5] As a result, an arrest file was created for Mrs. Milligan.[6]

Officer Doug Anderson of the Metro Police Department, who was a specially deputized U.S. Marshal for the purpose of Operation Falcon III, served as the team leader for Mrs. Milligan's arrest, and, on the morning of her arrest, had in his possession the arrest file for Mrs.

---

[5]Deputy Marshal Koback originally testified that he believed that he sent the later list he received from Sargent Bourk to the T.B.I., and the plaintiffs rely on that testimony in disputing Metro's assertion that Deputy Marshal Koback mistakenly sent the earlier list to the T.B.I.. However, the fact that the earlier list contained Mrs. Milligan's name while the later list did not, coupled with the fact that the list that Deputy Marshal Koback actually forwarded to the T.B.I. contained Mrs. Milligan's name, demonstrates that Deputy Marshal Koback could not possibly have forwarded the later list to the T.B.I., as he testified. Moreover, Deputy Marshal Koback has acknowledged that his initial testimony was mistaken and has submitted an affidavit to this effect. (Docket No. 179 at 2-3; Docket No. 179-1.)

[6]As detailed in a previous ruling issued by this court in this case (Docket No. 84), as part of its process, the T.B.I. conducted searches of various databases for identifying information and a criminal record check that revealed that Mrs. Milligan had no criminal record on the national crime database, no outstanding warrants, and no local warrants. This information was entered into a worksheet, which was placed in the arrest file. The worksheet also contained a section asking whether or not the warrant for the individual in question had been "confirmed." This section was left blank.

5

Milligan that had been prepared by the T.B.I.[7]  That arrest file did not contain a copy of the capias for the arrest of Ms. Milligan/Staps.  However, prior to arresting Mrs. Milligan and consistent with Metro Police Department policy, Officer Anderson radioed the Warrants Division of the Metro Police Department to verify whether the capias was still active and had a brief conversation with Rita White, a warrants clerk.  During this conversation, which was recorded, Officer Anderson provided Ms. White with Mrs. Milligan's name and date of birth.  Ms. White responded almost immediately to the effect that the capias remained outstanding.  However, it is undisputed that, given the short period of time in which that conversation took place, Ms. White could not possibly have located the capias and read it prior to providing verification to Officer Anderson.  (Docket No. 180 ¶ 19.)  Further, had she physically looked at the capias, as she was required, she likely would have realized that the date of birth provided by Officer Anderson did not match the date of birth on the capias, prompting some further investigation as to whether Mrs. Milligan was, in fact, the individual identified in the outstanding capias.

After this communication between Officer Anderson and Ms. White, a number of law enforcement officers, including Officers Wesley Terry and Craig Reese of the Metro Police Department, who had been deputized as U.S. Marshals for the purpose of Operation Falcon III, arrived at Mrs. Milligan's home.  The precise details regarding Mrs. Milligan's arrest and subsequent detention were recounted in a previous ruling by this court (Docket No. 84) and need

---

[7]Officer Anderson testified that he could not recall whether he had reviewed the arrest file prior to arresting Mrs. Milligan.  Further, upon reviewing the information contained in the arrest file during his deposition, he testified that, had he reviewed it at the time, it would have caused him considerable concern as to whether Mrs. Milligan was, in fact, the individual identified in the capias.

not be revisited in detail here. Suffice it to say that Mrs. Milligan and her husband both protested her arrest, asserting that the officers had the wrong person, but the officers nonetheless arrested Mrs. Milligan without making any further attempts to confirm that they were arresting the right person.[8] After her arrest, Mrs. Milligan was taken to LP Field, where she was transferred into the custody of other law enforcement officials until her husband was able to post bond, approximately six or seven hours after her arrest.

On November 1, 2006, the criminal charges against Mrs. Milligan were dismissed by the Criminal Court for Davidson County, Tennessee, upon finding that Mrs. Milligan was not the individual identified in the capias and that she had been falsely arrested, charged, booked, and jailed. An order confirming that dismissal was issued on November 6, 2006.

## II.     The News Report Regarding Mrs. Milligan's Arrest

Daniel Shelton, a Deputy U.S. Marshal and Public Affairs Officer, served as the media coordinator for Operation Falcon III. Before the operation commenced, Deputy Marshal Shelton contacted local media outlets, including WZTV-Fox 17, a station operated by Sinclair Television of Nashville, Inc. ("Fox 17/Sinclair"), and offered those outlets the opportunity to "ride-along" and report on the operation, contingent upon those outlets embargoing their reports until the operation's conclusion. Fox 17/Sinclair agreed to that condition and accepted the opportunity to ride along with law enforcement officers on the operation.

---

[8]Although the plaintiffs insinuate that the officers were under some obligation to verify Mrs. Milligan's identity based on her and her husband's insistence that the officers were making a mistake, this argument is unpersuasive, as many arrestees make this claim, and most such claims are false.

7

On October 24, 2006, the day of Mrs. Milligan's arrest, Fox 17/Sinclair reporter John Dunn, videographer Robert Brown, and Deputy Marshal Shelton followed the team that conducted Mrs. Milligan's arrest in a separate vehicle and observed as the team conducted a number of arrests as part of Operation Falcon III, including the arrest of Mrs. Milligan. As Mrs. Milligan was being arrested, Mr. Dunn and Mr. Brown observed and filmed the events from the street in front of the Milligans' home. Mrs. Milligan testified that she was aware that the arrest was being filmed, although she was unaware of who was filming the incident. Over the course of the ten days following the arrest, neither Mrs. Milligan nor her counsel contacted Fox 17/Sinclair or any other news media outlet to inform them that her arrest was made in error.

On November 2, 2006, the day after the charges against Mrs. Milligan were dismissed, the news embargo was lifted, and Fox 17/Sinclair broadcast a report about Operation Falcon III. That report included, among other things, interviews with police officers and video footage of two arrests, including that of Mrs. Milligan. The report included the statement that the arrests were made "with warrants in hand." The report also included the statement "Their first arrest came early: Paula Milligan, wanted on four counts of forgery and one count of identity theft," accompanied by approximately seven seconds of video depicting Mrs. Milligan being escorted by one of the arresting officers. Shortly after the report was broadcast, Fox 17/Sinclair posted, to its public website, video of the report and a shorter text version of the report.

On November 3, 2006, after the report was broadcast, Mrs. Milligan's counsel informed Fox 17/Sinclair that Mrs. Milligan's arrest had been improper and demanded that Fox 17/Sinclair cease publishing arrest information about Mrs. Milligan. After being so notified, Fox 17/Sinclair did not broadcast any further news reports regarding Mrs. Milligan's arrest. Fox 17/Sinclair also

8

took steps to remove content regarding Mrs. Milligan from its public website, although the original report remained on the website until November 13 or 14, 2006.

## III. Procedural History

This case originally began as two separate causes of action filed by the Milligans, which since have been consolidated by this court.

On October 23, 2007, Mrs. Milligan and Mr. Milligan filed an action in this court, Case No. 3:07-cv-1053, naming as defendants the United States, the U.S. Marshals Service, Metro, Officers Terry and Reese, four unknown U.S. Marshals (two of whom have since been identified as Deputy Marshals Koback and Shelton), Fox 17/Sinclair, and a number of unknown agents, employees, and servants of the U.S. Marshals Service, Metro, and Fox 17/Sinclair. The plaintiffs asserted (1) a claim against the federal and municipal defendants for violating Mrs. Milligan's constitutional rights by virtue of her false arrest; (2) a claim against the federal and municipal defendants for violating both Mrs. Milligan's and Mr. Milligan's constitutional rights by virtue of the search of their home; (3) a *Monell* pattern and practice claim against the U.S. Marshals Service and Metro alleging unconstitutional polices, practices, or customs on the part of those entities; (4) a claim of false light invasion of privacy against all of the defendants; and (5) a claim of libel against all of the defendants. (Docket No. 1.) On April 1, 2008, the plaintiffs filed their First Amended Complaint, in which they alleged essentially the same causes of action. (Docket No. 76.)

On January 18, 2008, the United States, the U.S. Marshals Service, Deputy Marshals Koback and Shelton, Officers Terry and Reese, and the two unknown U.S. Marshals moved to dismiss all of the claims against them on the grounds of qualified immunity and sovereign

9

immunity.  (Docket No. 44.)  The court treated that motion to dismiss as one for summary

judgment and, on May 2, 2008, dismissed all claims against the United States and the U.S.

Marshals Service, as well as all claims against Deputy Marshals Koback and Shelton and

Officers Terry and Reese in their official capacities.  (Docket Nos. 84 & 85.)  The court also

dismissed all claims for declaratory and injunctive relief against the deputy marshals and officers

in their individual capacities.  (*Id.*)  Finally, the court dismissed all claims for monetary relief

against Deputy Marshal Koback and dismissed the claim for monetary relief against Deputy

Marshal Shelton arising from the search of the Milligans' home, but did not dismiss the claim for

monetary relief against Deputy Marshal Shelton arising from Mrs. Milligan's arrest.  (*Id.*)

On the same day that they filed their lawsuit in federal court, the Milligans also filed an

action in the Circuit Court of Davidson County, Tennessee, naming as defendants Metro,

Officers Terry and Reese, Fox 17/Sinclair, and a number of unknown agents, employees, and

servants of Metro and Fox 17/Sinclair.  The plaintiffs asserted claims under a variety of

Tennessee statutes, including allegations that the law enforcement defendants failed to exhibit a

warrant in violation of Tenn. Code Ann. § 40-7-106(a), failed to provide Mrs. Milligan with a

telephone call while she was in custody in violation of Tenn. Code Ann. § 40-7-106(b), failed to

take Mrs. Milligan before a magistrate to determine the lawfulness of her arrest in violation of

Tenn. Code Ann. § 40-7-204, and engaged in the unauthorized exercise of official power and an

unlawful arrest in violation of Tenn. Code Ann. §§ 39-16-402 and -403.  (Case No. 3:08-cv-0380

Docket No. 1-1.)  The plaintiffs also asserted tort claims of negligence, conspiracy, assault and

battery, false arrest, false imprisonment, invasion of privacy, libel, malicious prosecution,

negligent infliction of emotional distress, and intentional infliction of emotional distress /

10

outrageous conduct.  (*Id.*)  On April 15, 2008, the state case was removed to this court by Officers Terry and Reese on the grounds that the tort claims against these officers fall under the Federal Tort Claims Act ("FTCA"), as those officers were acting as deputized U.S. Marshals at all times relevant to the Milligans' claims.  (Case No. 3:08-cv-0380 Docket No. 1.)  That case became Case No. 3:08-cv-0380 before this court.  (*Id.*)

Officers Terry and Reese moved to dismiss the complaint that was removed from state court (Case No. 3:08-cv-0380 Docket No. 4), and, on May 29, 2008, the court granted that motion, dismissing the claims against the United States on the grounds that the plaintiffs had not exhausted their administrative remedies under the FTCA (Case No. 3:08-cv-0380 Docket No. 16).  The court nevertheless exercised supplemental jurisdiction over the remaining claims in Case No. 3:08-cv-0380 in light of the pendency of the related case, Case No. 3:07-cv-1053.  (*Id.*)  Thereafter, on August 11, 2008, the parties agreed to consolidate the two cases, with the earlier-filed case serving as the lead case.  (Docket No. 101; Case No. 3:08-cv-0380 Docket No. 19.)

Since the cases were consolidated, the plaintiffs have filed a second amended complaint in Case No. 3:07-cv-1053 (Docket No. 122) and an amended complaint in Case No. 3:08-0380 (Docket No. 119), neither of which made any substantive changes to the original claims alleged by the plaintiffs.  The plaintiffs then moved for leave to file a third amended complaint in Case No. 3:07-cv-1053 and a second amended complaint in Case No. 3:08-0380 to add a claim under the FTCA.  (Docket Nos. 139, 139-1, & 139-2.)  In an order dated April 30, 2009, the court addressed the federal defendants' argument that the inclusion of the FTCA claim in both complaints was redundant and dismissed the plaintiffs' FTCA claim and Officers Terry and Reese from the complaint in Case No. 3:08-0380, while indicating that it would permit the

11

amendment to state an FTCA claim in Case No. 3:07-cv-1053. (Docket No. 159.) For whatever reason, however, the plaintiffs' motion to amend remains outstanding on the docket. Consistent with this court's April 30, 2009 ruling, therefore, that motion will be granted except to the extent that the plaintiffs' FTCA claim and Officers Terry and Reese have been dismissed from Case No. 3:08-0380 pursuant to the court's April 30, 2009 Order.

Finally, on July 6, 2009, the court granted the parties' joint motion to dismiss the plaintiffs' claims against Officers Terry and Reese, Deputy Marshals Koback and Shelton, and any remaining unknown U.S. Marshals in Case No. 3:07-cv-1053. (Docket No. 185.) As such, the claims that remain include the FTCA claim against the United States, the claims against Fox 17/Sinclair, and the claims against Metro. It is the claims against Fox 17/Sinclair and Metro that are the subject of the remainder of this memorandum.

<u>**ANALYSIS**</u>

Both Fox 17/Sinclair and Metro have moved, separately, for summary judgment with respect to the claims asserted against them.

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

12

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.    Fox 17/Sinclair's Motion for Summary Judgment

Fox 17/Sinclair has moved for summary judgment with respect to the claims arising under Tennessee state law that the plaintiffs have asserted against it—namely, claims of libel, false light invasion of privacy, and outrageous conduct.

### A.    Libel

Fox 17/Sinclair asserts that the plaintiffs cannot establish their libel claim because the report in question is protected by Tennessee's fair report privilege and Fox 17/Sinclair did not have the requisite state of mind for the plaintiffs to be able to overcome that privilege.

Under Tennessee law, both libel and slander are forms of the tort of defamation. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). To establish a defamation claim, a plaintiff must demonstrate that the defendant published a false and defamatory statement with knowledge of the statement's falsity, reckless disregard for the statement's truth, or negligence in failing to ascertain the statement's truth. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978) (citing Restatement (Second) of Torts § 580B (1977)). The precise state of mind that is required to sustain a defamation claim varies depending on the identity of the parties involved.

In *New York Times v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that the First Amendment to the United States Constitution provides protection from defamation claims in certain circumstances. Under *New York Times*, a public official may not recover on a defamation claim unless the allegedly defamatory statement was made with "'actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*

14

at 279. Subsequently, the Supreme Court clarified that, although the "actual malice" standard applies to defamation claims by public officials, states are permitted to establish the applicable standard of liability with respect to defamation claims by private individuals, "so long as they do not impose liability without fault." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). Following the rulings in *New York Times* and *Gertz*, the Tennessee Supreme Court adopted "the ordinary negligence standard permitted by *Gertz* for all defamation actions brought by private persons against media defendants." *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978).[9] Thus, as a general matter of Tennessee law, a private individual, such as Mrs. Milligan, who brings a defamation claim against a media defendant, such as Fox 17/Sinclair, need only establish that the defendant acted negligently in publishing the allegedly defamatory statement. *Nichols*, 569 S.W.2d at 418.

Fox 17/Sinclair does not dispute that Mrs. Milligan is a private individual and that the lesser negligence standard would ordinarily govern her defamation claim but, instead, argues that the actual malice standard nevertheless applies because the report is qualifiedly privileged pursuant to Tennessee's "fair report" privilege. The fair report privilege protects certain

---

[9]Also in *Nichols*, the court addressed the proper placement of the burden, stating that the burden "rests upon the plaintiff to show defamation and prove damages. He need not show, however, that the statement is false. There is a legal presumption of falsity which the defendant may rebut by proving truth as a defense." *Nichols*, 569 S.W.2d at 420. Since then, however, the United States Court of Appeals for the Sixth Circuit has addressed the proper allocation of the burden in defamation cases brought under Tennessee state law and found that the *Nichols* court's allocation could have the effect of imposing defamation liability without fault, in contravention of *Gertz*. *See Wilson v. Scripps-Howard Broad. Co.*, 642 F.2d 371, 375-76 (6th Cir. 1981). As such, the Sixth Circuit has held that, "[a]s a matter of federal First Amendment law, the burden must be placed on the plaintiff to show falsity." *Id.* at 376; *see also Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("[A] private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant.").

statements from claims of defamation, so long as the statement constitutes "a fair and accurate summation" of an official government action. *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 284 (Tenn. Ct. App. 2007) (citing *Smith v. Reed*, 944 S.W.2d 623, 624 (Tenn. Ct. App. 1996)). Where the privilege applies, it may only be defeated with proof that the defendant acted with actual malice. *Stem v. Gannett Satellite Info. Network, Inc.*, 866 F. Supp. 355, 359 (W.D. Tenn. 1994) (citing *Langford v. Vanderbilt Univ.*, 287 S.W.2d 32, 36-37 (Tenn. 1956), and *Am. Pub'g Co. v. Gamble*, 90 S.W. 1005 (Tenn. 1906)). As such, the fair report privilege applies where an allegedly defamatory statement (1) is made in a report of an official government action; (2) that provides a fair and accurate summation of that action; and (3) is not made with actual malice.

### 1. Official action

The fair report privilege applies to a statement made "in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern," Restatement (Second) of Torts § 611 (cited in *Lewis*, 238 S.W.3d at 285), including statements made in reports of judicial proceedings, public meetings, the contents of papers filed in court, the contents of arrest warrants, and the contents of search warrants, *Lewis*, 238 S.W.3d at 284-85. "The fair report privilege does not extend so far as to provide protection from liability for fair and accurate statements made by any governmental employee in any circumstance" but, rather, "remains limited to circumstances involving public proceedings or official actions of government that have been made public." *Id.* at 285. In any event, however, an arrest by a law enforcement official constitutes an official action such that "a report of the fact of the arrest or of the charge of crime" falls within the scope of the fair report privilege. *Id.* at 287. As such, courts in

16

Tennessee and elsewhere have applied the fair report privilege to news reports made in reliance on police communications, both written and verbal, regarding the arrest of a criminal suspect. *See, e.g.*, *Kenney v. Scripps Howard Broad. Co.*, 259 F.3d 922, 924 (8th Cir. 2001) (news report based on police reports); *Alsop v. Cincinnati Post*, 24 F. App'x 296, 297-98 (6th Cir. 2001) (news report based on U.S. Attorney's press release); *Yohe v. Nugent*, 321 F.3d 35, 43 (1st Cir. 2003) (news report based on statements made by police chief); *Hudak v. Times Pub'g Co.*, 534 F. Supp. 2d 546, 572 (W.D. Pa. 2008) (news report based on statements made by District Attorney); *Stem*, 866 F. Supp. at 359 (news report based on affidavit in support of arrest warrant).

To the extent that the report at issue here included statements about Mrs. Milligan, it provided only that "[the] first arrest came early: Paula Milligan, wanted on four counts of forgery and one count of identity theft" and that the arrest took place "with warrants in hand." The report contained no further statements about Mrs. Milligan. Moreover, Mr. Dunn, the Fox 17/Sinclair reporter, testified that he received Mrs. Milligan's name and the charges on which her arrest were based from Deputy Marshal Shelton, who was the team leader overseeing Mrs. Milligan's arrest.[10] Thus, the entirety of the statements in the report regarding Mrs. Milligan related to her arrest and the charges on which that arrest was based and were premised on

_____

[10]Mr. Dunn testified that, at some point on October 24, 2006 while he was accompanying law enforcement officials on Operation Falcon III, he asked Deputy Marshal Shelton "who is it that we're here for and can you find out what that person's name is and what they're charged with," and Deputy Marshal Shelton provided him with that information as it pertained to Mrs. Milligan. (Docket No. 164-5 at 20-21.) Although Mrs. Milligan attempts to cast aspersions on Mr. Dunn's testimony by arguing that the arresting officers did not have a copy of the capias in their possession at the time of their arrest, it is undisputed that the officers did have access to the arrest file prepared by the T.B.I. and there is no basis for doubting Mr. Dunn's testimony that he received this information from Deputy Marshal Shelton.

information that Mr. Dunn received from the law enforcement official responsible for the arrest. As such, the report is properly characterized as the report of an official government action.

2. Fair and accurate summary

In addition to constituting a report of an official action, a statement must also provide a fair and accurate summary of that action to be entitled to the protection of the fair report privilege. A report is not protected if it contains "any false statement of fact regarding what occurred during the proceeding, any garbled or one-sided account of the proceeding, or any defamatory observations or comments." *Lewis*, 238 S.W.3d at 284 (citing *Saunders v. Baxter*, 53 Tenn. (6 Heisk.) 369, 383 (1871), and *Black v. Nashville Banner Publ'g Co.*, 141 S.W.2d 908, 913 (Tenn. 1939)); *Langford*, 318 S.W.2d at 574. However, a "report need not be a verbatim, technically accurate account in every detail, as long as it conveys a correct and just impression of what took place," *Lewis*, 238 S.W.3d at 284, and exhibits "elements of balance and neutrality," *Smith*, 944 S.W.2d at 624.

Mrs. Milligan argues that the report was not accurate to the extent that it included the phrase "with warrants in hand" when, in fact, law enforcement officials did not have the capias, or a copy thereof, physically in their possession at the time of the arrest. As an initial matter, the parties dispute whether the phrase "with warrants in hand" referred specifically to Mrs. Milligan's arrest or, more generally, to the arrests made during Operation Falcon III. However, even if the phrase did refer to Mrs. Milligan, a reasonable inference that the court must draw in Mrs. Milligan's favor in considering Fox 17/Sinclair's motion for summary judgment, the report nevertheless provided a correct and just impression of the fact of Mrs. Milligan's arrest and the charges on which that arrest was based.

18

Mrs. Milligan relies on the testimony of Ronnie Adcock, Fox 17/Sinclair's executive producer, that the use of the phrase "warrants in hand" in a report conveys that there is a legal justification for the arrest. (Docket No. 164-7 at 54.) Even if it was technically inaccurate to state that the warrant was physically "in hand" at the time of Mrs. Milligan's arrest, the fact is that Mrs. Milligan was arrested pursuant to a capias, which provided a legal justification for the arrest, just as Mr. Adcock testified. Further, the use of the phrase "warrants in hand" conveyed nothing about Mrs. Milligan's guilt or innocence. The fact that Mrs. Milligan was the unfortunate victim of a case of mistaken identity does not defeat the fact that she was arrested pursuant to the capias as a matter of fact. Likewise, although Mrs. Milligan argues that the report was not fair and accurate to the extent it described her as "wanted," the fact is that the person named in the capias *was* "wanted" at the time of the arrest; this statement is inaccurate only to the extent that Mrs. Milligan was not the person named in the capias.

Mrs. Milligan further argues that the report was not a fair and accurate summary of her arrest to the extent that the report focused on the serious nature of the alleged crimes for which other individuals were arrested during Operation Falcon III—felonies that included drug dealing, sex offenses, and gang activity. Mrs. Milligan argues that, by including her in the report, Fox 17/Sinclair unfairly and inaccurately associated her with such serious criminal activity. Again, however, the report provided a correct and just impression of the fact of Mrs. Milligan's arrest on certain charges. Fox 17/Sinclair did not omit relevant details or provide a one-sided or slanted view of the facts. Moreover, the report specified that Mrs. Milligan was arrested on charges of forgery and identify theft, substantially undermining the likelihood that a viewer

19

would infer from the report that Mrs. Milligan was implicated in crimes involving drugs, sex, and gang activity.

Thus, the Fox 17/Sinclair report was a fair and accurate summary of an official action, and is entitled to the protection of the fair report privilege, unless Mrs. Milligan can demonstrate that the report was broadcast with actual malice.

### 3. Actual malice

The issue that will determine whether the fair report privilege applies, and the issue that the parties most vigorously dispute, is whether Fox 17/Sinclair's actions constituted actual malice, in which case the privilege is defeated. Actual malice requires a showing that the defendant published a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80; *Stem*, 866 F. Supp. at 360; *Press*, 569 S.W.2d at 441. Actual malice involves a total disregard for the truth, rather than merely ill-will, hatred, spite, or a desire to injure the plaintiff.[11] *Tomlinson v. Kelley*, 969 S.W.2d 402, 406 (Tenn. Ct. App. 1997). Moreover, to defeat a motion for summary judgment, the plaintiff bears the burden of demonstrating, by clear and convincing evidence, that actual malice existed. *Lewis*, 238 S.W.3d at 293; *see also New York Times*, 376 U.S. at 285-86.

---

[11]It is worth noting that the standard for demonstrating actual malice presumes the falsity of the allegedly defamatory statement. In this case, there appear to be serious questions as to whether the allegedly defamatory statements were untrue at all, which not only would undermine the plaintiffs' argument with respect to actual malice and the application of the fair report privilege, but also would call into serious doubt the plaintiffs' ability to establish their libel claim if the privilege did not apply. In any case, the court need not address the falsity of the statements, as it finds that there is no issue of fact with respect to actual malice in any event and that, therefore, the fair report privilege applies.

Mrs. Milligan asserts that the question of actual malice is a jury question, relying on a case that involved the application of Pennsylvania law regarding the fair report privilege and in which the court concluded that whether the privilege is overcome "is a factual question for the jury." *Hudak*, 534 F. Supp. 2d at 560. Under Tennessee law, however, the determination as to whether the plaintiff has established clear and convincing evidence of actual malice is a question of law, and thus libel claims such as Mrs. Milligan's are "particularly well-suited" for resolution at the summary judgment stage. *Lewis*, 238 S.W.3d at 283. Moreover, even the *Hudak* court acknowledged that summary judgment is appropriate on the question of actual malice where "the evidence is so clear that no reasonable person would determine the issue in any way but one." *Hudak*, 534 F. Supp. 2d at 560; *see also Washington Post Co. v. Keogh*, 365 F.2d 965, 967-68 (D.C. Cir. 1966) (noting that state of mind is not a jury issue in all contexts and that summary judgment may be appropriate, "especially where the issue is recklessness, which is ordinarily inferred from objective facts" and especially in the First Amendment arena).

Here, there is very little evidence, let alone clear and convincing evidence, that Fox 17/Sinclair acted with actual malice. Instead, Mrs. Milligan merely erects a house of inferential cards in an effort to establish that an issue of fact exists as to whether Fox 17/Sinclair acted with actual malice. Mrs. Milligan's argument is largely premised on Mr. Dunn's deposition testimony, in which he stated that he obtained information about Mrs. Milligan from Deputy Marshal Shelton and did no further independent investigation into the charges against Mrs. Milligan. (Docket No. 164-5 at 20-21.) Also, according to Mr. Dunn, he was aware that officers on the scene had, in their possession, folders regarding the arrested individuals, but that he never saw the contents of those folders himself. (*Id.* at 45.) He stated that it was his understanding

21

that the law enforcement officers would have had the capias in their possession at the time of the arrest. (*Id.*) Mr. Dunn also testified about the methods he uses in investigating a report generally, stating that he has consulted public records such as court filings in conjunction with investigations he has conducted in the past. (*Id.* at 15-16.) Finally, Mrs. Milligan relies on Mr. Dunn's speculation during his deposition that, had he actually seen the capias, the physical differences between Mrs. Milligan and the individual described in the capias would have served as a "red flag" as to whether Mrs. Milligan was actually the subject of the capias. (*Id.* at 24-26.)

Based on this testimony, Mrs. Milligan posits that it is reasonable to infer that Mr. Dunn must have seen the capias, despite his uncontroverted testimony to the contrary, because the arresting officers did not have a copy of the capias in their possession at the time of the arrest and because the news report accurately cited the charges on which Mrs. Milligan was arrested. Building on this tortured inference and Mr. Dunn's testimony that the capias would have raised "red flags," Mrs. Milligan argues that Mr. Dunn was or should have been aware that her arrest was in error before the Fox 17/Sinclair report was broadcast. Mrs. Milligan further argues that Mr. Dunn should have been aware of the fact that there was no basis for her arrest because the charges against her were dismissed on November 1, 2006, before the report was broadcast, based on the fact that Mr. Dunn testified that he sometimes reviews court records in the course of an investigation.

The conclusions that Mrs. Milligan draws, however, are based not on any reasonable inference but, rather, upon layers of unreasonable inference upon unreasonable inference. Mr. Dunn's testimony was clear that Deputy Marshal Shelton provided him with the information regarding Mrs. Milligan's arrest and that the Fox 17/Sinclair report was based on that

22

information. Mr. Dunn stated that he did no further independent investigation of the charges on which Mrs. Milligan was arrested, and there is no reason to doubt his testimony or to conclude that, contrary to his testimony, he ever actually saw the capias. There is nothing to indicate that Mr. Dunn had any reason to doubt the information he received from Deputy Marshal Shelton and thus nothing that would have alerted him to conduct any further investigation. A "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). Moreover, the mere fact that Mr. Dunn testified that he sometimes reviewed court records in the course of other investigations does not mean that he could have or should have continually monitored the status of court filings in Mrs. Milligan's case, nor that his failure to do so constituted actual malice.

Mrs. Milligan further attempts to demonstrate actual malice by arguing that Fox 17/Sinclair did not have any explicit guidelines or policies governing the process by which a reporter verifies the accuracy of a report, as news director Ken Smith and executive producer Ronnie Adcock both testified. (Docket No. 164-7 at 46-47; Docket No. 164-10 at 40-41.) Mrs. Milligan also relies on the fact that Mr. Adcock testified that he never saw any supporting documentation regarding Mrs. Milligan's arrest and did nothing personally to verify the accuracy of the report and that he instead relied on Mr. Dunn and expected that Mr. Dunn would have seen the warrant personally. (Docket No. 164-7 at 45-47, 57.) While it may well be the case that the process by which Fox 17/Sinclair generally verifies a report could be more thorough and that Mr. Dunn could have been more cautious by reviewing the capias himself, neither of these facts satisfies the high bar required to establish actual malice—that is, there is no indication that

23

Mr. Dunn, Mr. Adcock, or, by extension, Fox 17/Sinclair acted with reckless disregard of the falsity of the information published in the report.

Finally, Mrs. Milligan argues that the fact that the report was not removed from Fox 17/Sinclair's website immediately upon its receiving notification from Mrs. Milligan's attorney that her arrest was in error demonstrates actual malice on Fox 17/Sinclair's part. However, the fact is that Fox 17/Sinclair did not broadcast any reports about Mrs. Milligan's arrest after it was notified that the arrest was false and took steps to remove content regarding Mrs. Milligan's arrest from its website.[12] Given these efforts, the fact that the content regarding Mrs. Milligan's arrest remained on the website until November 13 or 14 does not establish a genuine issue of fact as to actual malice.

As there is no genuine issue of fact as to the existence of actual malice, the report published by Fox 17/Sinclair is protected by the fair report privilege and, therefore, summary judgment is appropriate for Fox 17/Sinclair with respect to this claim.

B.      *False Light Invasion of Privacy*

Tennessee has largely adopted the Restatement's definition of the tort of false light invasion of privacy, permitting liability where a defendant "gives publicity to a matter

_____

[12]Representatives of Fox 17/Sinclair have stated that they took efforts, in good faith, to remove the report from the website as soon as Mrs. Milligan's attorney notified them that Mrs. Milligan had been falsely arrested. (Docket No. 155-2 (Smith Aff. ¶¶ 23-26; Kordalski Aff. ¶¶ 6-12).) They further stated that, as of November 3, 2006, the report could no longer be accessed from any link on the Fox 17/Sinclair website. (Docket No. 155-2 (Smith Aff. ¶ 25; Kordalski Aff. ¶¶ 8-10).) However, after Mrs. Milligan's attorney again contacted Fox 17/Sinclair on November 13, 2006 and alerted them that she could still access the report by searching for specific terms on the Fox 17/Sinclair website, Fox 17/Sinclair discovered certain additional files relating to the report, at which time those files were also removed. (Docket No. 155-2 (Smith Aff. ¶¶ 30-31; Kordalski Aff. ¶¶ 13-17).)

concerning another that places the other before the public in a false light" such that (1) "the false light into which the other is placed would be highly offensive to a reasonable person" and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643-44 (Tenn. 2001) (citing Restatement (Second) of Torts § 652E (1977)); *Lewis*, 238 S.W.3d at 303. As with defamation claims, the heightened "actual malice" standard applies where a false light claim is brought by a public official or involves a matter of public concern, while a lesser negligence standard applies where a false light claim is brought by a private individual. *West*, 53 S.W.3d at 647-48.

The court need not address the merits of Mrs. Milligan's false light claim, however, as the fair report privilege applies to the Fox 17/Sinclair report, as discussed *supra*, and therefore protects Fox 17/Sinclair from liability for false light invasion of privacy. *See id.* at 648 (noting that "absolute and conditional privileges apply to the invasion of privacy torts" and affirming that "such privileges previously recognized in Tennessee apply to false light claims"). Summary judgment will, therefore, be granted for Fox 17/Sinclair with respect to this claim.

C.    *Outrageous Conduct*

To establish a claim of outrageous conduct, a plaintiff must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was "so outrageous that it is not tolerated by civilized society"; and (3) resulted in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 322 (Tenn. 1997) (citing *Medlin v. Allied Inv. Co.*, 298 S.W.2d 270, 274 (Tenn. 1966)). First, it appears that Mrs. Milligan has abandoned this claim, as she makes no argument in opposition to Fox 17/Sinclair's motion for summary judgment with respect to this claim. Moreover, given the

25

court's finding above that Fox 17/Sinclair did not act with actual malice, Mrs. Milligan likewise

is unable to establish a genuine issue of fact as to the first element of her outrageous conduct

claim, that Fox 17/Sinclair's conduct was intentional or reckless. Thus, summary judgment will

be granted for Fox 17/Sinclair with respect to this claim.

### III. Metro's Motion for Summary Judgment

Metro has also moved for summary judgment with respect to the claims that the plaintiffs

assert against it, including both the federal law claims that the plaintiffs assert in Case No. 3:07-

1053 and the state law claims that the plaintiffs assert in Case No. 3:08-0380.

#### A. *Federal Claims*

The thrust of the plaintiffs' federal claims against Metro is that Metro is liable by virtue

of an unconstitutional municipal policy, practice, or custom, pursuant to *Monell v. Department of*

*Social Services*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held that, while a

municipality may be not be held liable for the unconstitutional actions of its employees or agents

under a *respondeat superior* theory, a municipality may be held liable where the unconstitutional

actions of its employees or agents resulted from the execution of an official policy or custom. *Id.*

at 694; *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Thomas v. City of*

*Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

To prove the existence of an unconstitutional municipal policy or custom, a plaintiff may

rely on evidence of "a policy of inadequate training or supervision" or "a custom of tolerance or

acquiescence of federal rights violations," among other types of policies or customs. *See*

*Thomas*, 398 F.3d at 429. Where a plaintiff wishes to establish the existence of an

unconstitutional municipal policy or custom by virtue of a failure to train or supervise, the

plaintiff must demonstrate: (1) training or supervision that was inadequate under the circumstances; (2) the municipality's deliberate indifference; and (3) a causal link between the municipality's failure to train or supervise and the alleged constitutional violation.[13] *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A plaintiff may establish deliberate indifference by demonstrating a municipality's failure to train or supervise in light of the foreseeable consequences of that failure or by demonstrating that the municipality failed to respond to previous complaints of constitutional violations. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999); *see also City of Canton*, 489 U.S. at 390 (noting that deliberate indifference may be demonstrated where, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"); *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (requiring a plaintiff to demonstrate "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury").

---

[13]In contrast to a failure to train or supervise claim, where a plaintiff seeks to establish a *Monell* claim by demonstrating that the municipality had a custom of tolerance or acquiescence of constitutional violations, the plaintiff must provide evidence of (1) a clear and persistent pattern of rights violations; (2) notice or constructive notice of this pattern on the part of the municipality; (3) the municipality's deliberate indifference; and (4) a causal link between the municipality's failure to act and the alleged constitutional violation. *Thomas*, 398 F.3d at 429. Metro asserts that this standard governs the plaintiffs' claims; however, the plaintiffs' claim is in the nature of a failure to train or supervise adequately rather than in the nature of a so-called "inaction" claim, and thus the test for a failure to train or supervise claim, as discussed in *Ellis v. Cleveland Municipal School District*, 455 F.3d 690 (6th Cir. 2006), is applied here.

27

Here, the plaintiffs' *Monell* claims against Metro arise from the series of errors that led to

Mrs. Milligan's arrest on the basis of the capias that had been issued for Ms. Milligan/Staps.

Specifically, those errors were:

> (1) The fact that when Mr. Pride, the data entry clerk, created a computer entry
> for the capias issued for Ms. Milligan/Staps, he relied on information about Mrs.
> Milligan contained in the police department's Master Name Index without cross-
> referencing that information with information contained on the capias, resulting in
> the erroneous linkage of individual identifiers for Mrs. Milligan with the capias
> issued for Ms. Milligan/Staps.

> (2) The fact that Deputy Marshal Koback mistakenly sent the T.B.I. a list of
> outstanding warrants that had not been "cleaned" and thus erroneously included
> Mrs. Milligan's name, resulting in the T.B.I.'s creation of an arrest file for Mrs.
> Milligan.[14]

> (3) The fact that Ms. White, the warrants clerk, did not actually review the capias
> issued for Ms. Milligan/Staps and verify her name and date of birth when Officer
> Anderson radioed in to determine whether the capias was outstanding, resulting in
> a failure to observe the discrepancy between the information about Mrs. Milligan
> contained in the arrest file to which Officer Anderson had access and the actual
> capias issued for Ms. Milligan/Staps.

---

[14]As discussed above, *see* note 5 *supra*, Deputy Marshal Koback's initial testimony
regarding which list he sent to the T.B.I. is at odds with the facts—that is, because Mrs.
Milligan's name was on the list sent to the T.B.I., Deputy Marshal Koback could not possibly
have sent the T.B.I. the later list that he received from Sargent Bourk, as he testified. Deputy
Marshal Koback himself has acknowledged that this was the case and that his initial testimony
was likely based on an erroneous recollection. (Docket No. 179 at 2-3; Docket No. 179-1.) The
federal defendants strongly deny the characterization of Deputy Marshal Koback's actions as a
cause of Mrs. Milligan's arrest, however, arguing that the arrest would not have occurred but for
the errors committed by Metro employees, particularly Mr. Pride and Ms. White. (Docket No.
179 at 2, 4-5.) In addition, the plaintiffs continue to insist that Deputy Marshal Koback sent the
later list, on the basis of his now-debunked initial testimony, despite the fact that the facts and
Deputy Marshal Koback's own subsequent statements make clear that his initial testimony was
incorrect. (Docket No. 180 ¶¶ 13-15.) In any event, any claimed dispute about Deputy Marshal
Koback's actions and testimony is not borne out by the evidence and, further, is not material, as
the plaintiffs do not place emphasis on this particular error in support of their *Monell* claim.

Of these three errors, the parties focus their attention on the first and the third, and on the related testimony and other evidence.

As a preliminary matter, Metro argues that the plaintiffs never alleged a *Monell* claim based on these facts, and, thus, that the claim is not properly before the court. Metro argues that the *Monell* claim alleged in both the original complaint and in each successive amended complaint focused on the actions of Officers Terry and Reese, rather than on the actions of other Metro employees, such as Mr. Pride and Ms. White, and that any liability from the actions of Officers Terry and Reese does not flow to Metro, as those officers were deputized as U.S. Marshals for the purpose of the operation. However, the complaint names "presently unknown" employees of Metro as John Doe defendants, in addition to the named defendants. (Docket No. 139-1.) Moreover, the complaint's language is not exclusive, alleging constitutional violations that resulted from "*interrelated* de facto policies, procedures, and/or customs, which *included, inter alia*: a) a failure to train, supervise, discipline, transfer, monitor, counsel, and otherwise control U.S. Marshals and/or Deputy Marshals and Metro Nashville officers . . . . and b) by maintaining a law enforcement 'code of silence.'" (*Id.* ¶ 82 (emphasis added).) It further appears that many of the details regarding Mrs. Milligan's arrest were uncovered only in the course of discovery. Therefore, the court sees no reason why the plaintiff's complaint should not be understood as pleading the particular factual basis on which they presently are prosecuting their *Monell* claim against Metro.

As for the merits of the plaintiffs' *Monell* claim, both Mr. Pride and Ms. White testified that they were not provided with any specialized training for their work as a data entry clerk and a radio operator, respectively, and that they learned through on-the-job training. (Docket No.

29

Of these three errors, the parties focus their attention on the first and the third, and on the related testimony and other evidence.

As a preliminary matter, Metro argues that the plaintiffs never alleged a *Monell* claim based on these facts, and, thus, that the claim is not properly before the court. Metro argues that the *Monell* claim alleged in both the original complaint and in each successive amended complaint focused on the actions of Officers Terry and Reese, rather than on the actions of other Metro employees, such as Mr. Pride and Ms. White, and that any liability from the actions of Officers Terry and Reese does not flow to Metro, as those officers were deputized as U.S. Marshals for the purpose of the operation. However, the complaint names "presently unknown" employees of Metro as John Doe defendants, in addition to the named defendants. (Docket No. 139-1.) Moreover, the complaint's language is not exclusive, alleging constitutional violations that resulted from "*interrelated* de facto policies, procedures, and/or customs, which *included, inter alia*: a) a failure to train, supervise, discipline, transfer, monitor, counsel, and otherwise control U.S. Marshals and/or Deputy Marshals and Metro Nashville officers . . . . and b) by maintaining a law enforcement 'code of silence.'" (*Id.* ¶ 82 (emphasis added).) It further appears that many of the details regarding Mrs. Milligan's arrest were uncovered only in the course of discovery. Therefore, the court sees no reason why the plaintiff's complaint should not be understood as pleading the particular factual basis on which they presently are prosecuting their *Monell* claim against Metro.

As for the merits of the plaintiffs' *Monell* claim, both Mr. Pride and Ms. White testified that they were not provided with any specialized training for their work as a data entry clerk and a radio operator, respectively, and that they learned through on-the-job training. (Docket No.

29

180-8 at 23-24, 29; Docket No. 180-9 at 20, 24.)  Further, it is undisputed that the Metro Police Department did not have in place any method of auditing the entries made by data clerks other than the requirement that individual clerks, such as Mr. Pride, "self-audit" their work by double-checking their entries immediately after inputting those entries, and the requirement that an arresting officer verify a warrant or capias by radio prior to conducting an arrest.  (Docket No. 183 ¶¶ 18, 20, 27.)  It is also worth noting that Mr. Pride testified that he had suggested that Metro implement a system in which clerks on an incoming shift review the accuracy of the information entered by the clerks on the previous shift.  (Docket No. 180-8 at 38-39.)  Metro did not implement that suggestion at the time Mr. Pride made it, prior to Mrs. Milligan's arrest, but did implement such a system after Mrs. Milligan's arrest.  (Docket No. 183 ¶¶ 27, 33.)

There is some dispute between the parties as to whether there existed a policy requiring an arresting officer to possess a copy of the warrant at the time of an arrest or, at the very least, to have viewed the warrant before making the arrest.  The Standard Operating Procedure for Metro's Warrants Department states, "Copies of warrants will be used to attempt service." (Docket No. 180-6 Ex. 3 at 5.)  Metro however, relies on the testimony of Captain Karl Roller, who testified as the police department's representative, that this statement does not require an arresting officer to have a copy of a warrant in his or her possession, but merely prohibits an officer from removing the original from the Warrants Division when making an arrest.  (Docket No. 167-5 at 65-67.)    In any case, however, Captain Roller testified that it is a "recommended policy" that an arresting officer personally review the warrant before making an arrest, and "a best practice" that is "highly recommended" for an officer to take a copy of the warrant along when making an arrest.  (*Id.* at 21-22, 113.)

30

Moreover, it is undisputed that the Metro officers involved in Mrs. Milligan's arrest, even those such as Officers Anderson, Terry, and Reese, who had been deputized as U.S. Marshals for the purpose of Operation Falcon III, were still subject to the Standard Operating Procedures at the time of Mrs. Milligan's arrest (Docket No. 183 ¶ 10), that the arresting officers did not have a copy of the capias in their possession at the time of Mrs. Milligan's arrest (*id.* ¶ 7), that certain of the information contained in the arrest file varied from that contained in the capias (*id.* ¶ 14), and that, given these variances, no reasonable officer would have arrested Mrs. Milligan had he or she had a copy of the capias at the time of the arrest (*id.* ¶ 15). Moreover, it is undisputed that officers do not customarily have warrants in their possession when they conduct an arrest—not just in Mrs. Milligan's case, but as a general matter—and instead rely on radio operators, such as Ms. White, to verify the information contained in the original warrant or capias. (*Id.* ¶ 12.) Finally, it is undisputed that, in this case, Ms. White could not have actually verified the information in the original warrant when Officer Anderson radioed in, as she was required, given the fact that mere seconds elapsed before she provided verification and that, had she actually reviewed the capias, she would have realized that there was a discrepancy between certain information in the capias and the information provided by Officer Anderson,[15] likely

_____

[15]At her deposition, Ms. White acknowledged that she could not have obtained the capias and reviewed it prior to providing verification to Officer Anderson, given the short period of time that elapsed on the recording of the radio call. (Docket No. 180-9 at 48-49.) She surmised, however, that another officer was working in the Warrants Division that day and "helping" her by pulling the original capiases and warrants, reviewing them, and relaying verification to her, which she then passed along by radio to the requesting officer. (*Id.* at 34-36, 47-49,72-73.) However, Ms. White could not recall who it was that ostensibly retrieved the capias for her and there is no evidence whatsoever to corroborate her seemingly self-serving assertion that someone else was working in the Warrants Division on the day of Mrs. Milligan's arrest. Moreover, even crediting her testimony that she had assistance from an officer in obtaining and reviewing the capias, this explanation still does not account for the fact that neither Ms. White nor the officer

31

prompting either Ms. White or Officer Anderson to investigate further whether Mrs. Milligan's arrest was, in fact, proper.[16]  (Docket No. 168 at 6; Docket No. 183 ¶ 13.)

Further, a number of internal Metro Police Department publications reflect that problems related to both the inputting of information from warrants and capiases and the radio verification of information from those warrants and capiases existed prior to Mrs. Milligan's arrest.  A memorandum dated February 12, 2004 and addressed to "All clerks" stated:

> Beginning today, driver's license must be checked on every warrant entered. . . .
> Take special notice to the issue date of driver's license.  We are finding warrants
> where the demographics do not match the subject.  This is very pertinent in the
> service of any outstanding warrants.

(Docket No. 180-7 Ex. 6 at Bates 1442.)  Additionally, a memorandum dated March 22, 2006 and addressed to "All supervisors" stated:

> We are experiencing many unexplained arrests because of faulty warrant entry or
> failure to recall a warrant or citation.  This can not continue. . . . As of today we
> have a new policy on improperly entered warrants.  If warrant information is put
> into the computer incorrectly and it is brought to the attention of a ***supervisor*** we

---

she claims was helping did not notice the discrepancies between the information contained in the capias and that provided by Officer Anderson.  Finally, this issue is not genuinely in dispute in any case, as the parties concur that Ms. White did not personally review the original capias before providing verification to Officer Anderson.  (Docket No. 180 ¶ 19.)

[16]The parties do dispute, however, whether Officer Anderson should have known, based on the fact that only a few seconds elapsed between his request and Ms. White's verification, that Ms. White had not retrieved and reviewed the original capias before providing verification.  (Docket No. 183 ¶ 13.)  Metro points out that, in the event of a pre-planned arrest operation, radio operators often "pull" warrants in advance so that the warrants are at hand when an officer radios in for verification.  Thus, Metro argues that Officer Anderson would not necessarily have reason to believe that Ms. White had not actually viewed the original warrant before providing verification.  In any case, the relevant issue is not what Officer Anderson—or a reasonable officer—should have believed, given the short period of time that it took Ms. White to respond to the request for verification but, rather, whether these facts reflect Metro's inadequate training and supervision of its employees and its deliberate indifference to a risk of constitutional rights violations.

will take corrective action. . . . It is equally important to understand that the radio person plays a big part in this process, as always they should take the warrant out of the jacket and give the information that is on the warrant to the requesting officer.  The radio operator or disseminator of the information will be held to the same standard as the entry clerk.

(Docket No. 180-7 Ex. 6 at Bates 1440 (emphasis in the original).)  Finally, a flyer placed in the

clerks' office stated:

> RADIO PERSONS
> CLERKS AND OFFICERS
>
> AS OF 06-24-06 WHEN CONFIRMING A WARRANT OR WARRANT INFORMATION OVER THE RADIO OR PHONE:
> THE OPERATOR **WILL** / **SHALL** EACH TIME PULL THE WARRANT OUT OF THE JACKET AND REVIEW THE INFORMATION ON THE WARRANT, VERIFY THE INFORMATION ON THE WARRANT MATCHES THE INFORMATION GIVEN BY THE REQUESTING OFFICER
>
> **DO NOT ASSUME.**

(Docket No. 180-7 Ex. 6 at Bates 1441 (emphasis in the original).)

Taking this evidence together, the plaintiffs have adduced sufficient evidence to

withstand summary judgment with respect to the existence of an unconstitutional municipal

policy or custom, to the extent that Metro is alleged to have failed to train or supervise its

employees adequately.[17]  Particularly persuasive on this point is the fact that Metro did not have

---

[17]In addition, the plaintiffs attempt to argue that Metro's actions also reflect a failure to investigate on Metro's part.  However, the evidence does not bear out such a claim.  First, although Mr. Pride was not disciplined for his role in Mrs. Milligan's arrest, the plaintiffs have provided no evidence to counter Captain Roller's testimony that Mr. Pride left his employment before Metro learned of his role and that Metro was, therefore, unable to discipline him.  (Docket No. 180-7 at 62, 91.)  In addition, the plaintiffs acknowledge that Ms. White was subject to discipline as a result of Mrs. Milligan's arrest.  (Docket No. 181 at 15 n.3.)  The plaintiffs argue, however, that Mrs. Milligan's arrest was merely a pretext for discipline and that Ms. White was, in fact, disciplined in retaliation for a grievance she filed against a supervisor.  As such, the plaintiffs claim, no one, including Ms. White, was actually disciplined for their role in Mrs. Milligan's arrest.  This argument however, constitutes little more than baseless speculation about

in place any safeguards against the types of errors that occurred here—particularly, Mr. Pride's data entry error and Ms. White's radio verification error. While Metro claims that data entry clerks such as Mr. Pride were required to "self-audit" their work, such a practice can hardly be said to constitute a sufficient means of preventing data entry errors. Further, the radio verification system was virtually meaningless if radio operators such as Ms. White could provide verification without so much as glancing at the original capias. Such errors could easily be remedied by requiring an arresting officer to have in his or her possession a copy of the warrant or capias at the time of the arrest—and, indeed, there is a legitimate dispute as to whether the custom of the police department was in contravention of a stated policy to this effect. Moreover, Metro's argument is undermined by Captain Roller's testimony that, upon becoming head of the Warrants Division, he identified "issues that needed to be addressed" and "better practices [Metro] could adopt to try to further safeguard against arresting the wrong person." (Docket No. 180-7 at 22-23.) Indeed, following Mrs. Milligan's false arrest, Metro did, in fact, institute a more stringent procedure for double-checking a data entry clerk's work, by requiring each incoming shift to check the work performed by the previous shift, a procedure that had been suggested by Mr. Pride prior to Mrs. Milligan's arrest, but rejected by Metro at that time. (Docket No. 183 ¶¶ 27, 33.)

Metro argues that Mr. Pride's fourteen years on the job and Ms. White's fifteen years on the job constitute adequate training to defeat the plaintiffs' *Monell* claim. However, the fact is that not only was that training inadequate to prevent the errors that led to Mrs. Milligan's arrest,

---

the circumstances of the discipline to which Ms. White was subject.

but that similar errors had occurred in the past.[18]  Under the circumstances, it is a question of fact

whether the degree of training and supervision that Metro provided to its employees in the

Warrants Division—which Metro fully acknowledges amounts merely to on-the-job

training—was adequate.  Moreover, there is evidence that this failure to train or supervise was so

likely to result in the violation of individuals' constitutional rights—and did, in fact, result in

such violations on multiple occasions of which Metro was aware—that the court cannot but

conclude that there is an issue of fact as to whether Metro acted with deliberate indifference to

the rights of individuals such as Mrs. Milligan.

In support of their argument, the plaintiffs rely on the ruling of the United States Court of

Appeals for the Third Circuit in *Berg v. County of Allegheny*, 219 F.3d 261 (2000).  In that case,

the plaintiff was wrongly arrested after a clerk transposed two digits in entering a criminal

complaint into the municipality's computer system, resulting in the association of the plaintiff's

name, date of birth, social security number, and address with the criminal complaint pending

against a different individual.  *Id.* at 266-67.  The court noted that there was "no evidence of

procedures guarding against [the clerk's] mistake," "no 'double check' to ensure that warrants

were issued in the correct name," and no procedure "to ascertain if an erroneous warrant had

issued."  *Id.* at 276-77.  As such, the court found that there was a genuine issue of fact as to

---

[18]In addition to the errors referenced in the March 22, 2006 memorandum, Sargent Bourk testified that, on several instances, problems in the Warrants Division regarding the servicing of warrants led to police officers "picking up the wrong people."  (Docket No. 180-4 at 37-38.) Likewise, both Mr. Pride and Ms. White testified with respect to mistaken arrests stemming from errors made within the Warrants Department.  (Docket No. 180-8 at 38-39, 48-49; Docket No. 180-9 at 38.)

35

whether the municipality was deliberately indifferent to an obvious risk of constitutional violations. *Id.* at 277.

Here, Metro argues that *Berg* is distinguishable to the extent that, in *Berg*, there did not exist any procedures whatsoever to verify the accuracy of a warrant, whereas Metro required that the inputting data clerk "self-audit" by double-checking his or her work and that the arresting officer verify a warrant is still outstanding by radioing the Warrants Division before conducting an arrest. Once again, however, it is clear that these nominal procedures did not function to prevent, in any meaningful way, the type of errors that resulted in Mrs. Milligan's arrest. Indeed, errors of that exact nature had led to previous false arrests, a fact that was well-known to both police department employees and to Metro itself.[19] Further, although Metro argues that the existence of the memoranda and flyer reflects that policies were in place to ensure the proper functioning of the Warrants Division, it seems the opposite was in fact the case—the practices of the Warrants Division permitted repeated rights violations and Metro's meager attempts to prevent such violations were clearly inadequate. As a practical matter, and like the system at issue in *Berg*, there were no meaningful checks on Metro's system, either at the data entry stage

---

[19]Metro attempts to argue that these problems were not sufficiently widespread to establish a *Monell* claim. In making this argument, however, Metro draws on the elements required to establish an inaction claim under *Monell*, rather than a failure to train or supervise claim. *Compare Thomas*, 398 F.3d at 429 (elements of inaction claim) *with Ellis*, 455 F.3d at 700 (elements of failure to train or supervise claim). Moreover, even if the plaintiffs were pursuing an inaction claim, the documentary evidence and deposition testimony regarding the false arrests that occurred prior to Mrs. Milligan's arrest as a result of problems in the Warrants Division might well be sufficient to defeat summary judgment. Finally, Metro's reliance on *Herring v. U.S.*, 129 S. Ct. 695 (2009), is inapposite. That case presented the question of whether clerical errors in a computer database justified the suppression of evidence in a criminal case under the Fourth Amendment. Moreover, in *Herring* the court noted that, not only was there no evidence of widespread errors, but there was no evidence of any similar incident at all, unlike the case here.

36

to prevent a clerk's erroneous reliance on information from the Master Name List, or at the radio verification stage to prevent a clerk from providing the arresting officer with verification without actually physically looking at the relevant warrant or capias.

Metro also attacks Mr. Pride's credibility, noting that he was disciplined for a number of reasons, including his "truthfulness" and a previous incident in which Mr. Pride improperly entered information using the Master Name Index, which led to the false arrest of another citizen. Metro further argues that Mr. Pride's testimony, including statements that mistakes in the data entry process were "fairly common" and that the Warrants Division was "dysfunctional," in "constant chaos," and short-staffed was self-serving and merely represents Mr. Pride's attempt to "vent his grievances" against the police department, and that it cannot serve to establish an issue of fact with respect to the plaintiffs' *Monell* claim. However, the question of Mr. Pride's credibility as a witness is not one that may be resolved by the court at the summary judgment stage and, moreover, the plaintiffs have adduced substantial evidence, in addition to Mr. Pride's testimony, that would permit a reasonable fact-finder to conclude that Metro acted in deliberate indifference to the risk of rights violations.

As such, Metro's motion for summary judgment with respect to the plaintiffs' *Monell* claims based on Metro's alleged failure to train or supervise will be denied.

B.    *State Claims*

In Case No. 3:08-0380, the plaintiffs assert claims against Metro arising under various Tennessee statutes, including failure to exhibit a warrant in violation of Tenn. Code Ann. § 40-7-106(a), failure to provide Mrs. Milligan with a telephone call while she was in custody in violation of Tenn. Code Ann. § 40-7-106(b), failure to take Mrs. Milligan before a magistrate to

37

determine the lawfulness of her arrest in violation of Tenn. Code Ann. § 40-7-204, and

unauthorized exercise of official power and an unlawful arrest in violation of Tenn. Code Ann.

§§ 39-16-402 and -403.  The plaintiffs also assert a variety of state tort claims, including claims

of negligence, conspiracy, assault and battery, false arrest, false imprisonment, invasion of

privacy, libel, malicious prosecution, negligent infliction of emotional distress, intentional

infliction of emotional distress / outrageous conduct.[20]  Metro has moved for summary judgment

with respect to all of these claims.  In responding to Metro's motion, the plaintiffs did not

address Metro's argument that the statutory provisions under which the plaintiffs purported to

bring claims do not provide a private cause of action.  As such, summary judgment will be

granted for Metro with respect to the plaintiffs' state statutory claims.

As for the plaintiffs' state tort claims, Metro argues, much as it does in the context of the

federal claims addressed above, that any liability from the actions of Officers Terry and Reese

must be imputed to the United States rather than to Metro, as those officers were deputized as

U.S. Marshals for the purpose of the operation and, further, that the plaintiffs' complaint did not

allege the basis for any tort claims arising from the actions of any individuals other than Officers

Terry and Reese.  Again, however, this argument fails, as the allegations in the complaint were

sufficiently broad to encompass tort claims arising from the actions of Metro employees other

_____

[20]The plaintiffs also alleged claims of libel and invasion of privacy against Metro in Case
No. 3:07-cv-1053, although those claims are essentially duplicative of the same claims in Case
No. 3:08-cv-0380, and thus the following analysis applies equally to those claims.

38

than Officers Terry and Reese, including, especially, those individuals employed in the police department's Warrants Division.[21]

The plaintiffs' tort claims are governed by the Tennessee Government Tort Liability Act ("GTLA"), which provides that governmental entities are immune from lawsuits arising from the exercise or discharge of their governmental or proprietary functions, with certain exceptions. Tenn. Code Ann. § 29-20-201(a). One of the exceptions to this general rule provides that governmental entities are not immune where a plaintiff's injuries result from the negligence of a governmental employee. Tenn. Code Ann. § 29-20-205(1). However, in an exception to this exception, governmental entities are immune where injury results from a number of specified intentional torts, including "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." Tenn. Code Ann. § 29-20-205(2). Where an intentional tort is not included among this list of exempted torts, a governmental entity may only be held liable where the plaintiff makes "a direct showing [of] negligence on the part of the governmental entity" with respect to the employee's intentionally tortious conduct. *Pendleton v. Metro. Gov't of Nashville & Davidson County*, No.

---

[21]In the complaint, in addition to naming various John Doe defendants who were employed by Metro, the plaintiffs specifically allege that "Metro Nashville negligently screened, hired, trained, monitored, supervised, controlled, assigned, counseled, investigated and disciplined the Metro Officers and other officers which made the Metro Officers' improper actions a foreseeable result of Metro Nashville's widespread and systemic deficiencies. . . . The widespread and systemic deficiencies of Metro Nashville resulted in its failure to act in a reasonable and prudent manner and constitutes negligence under the laws of the State of Tennessee which was a proximate cause of the torts committed by Metro Officers and others." (Docket No. 139-2 ¶ 82.)

39

M2004-01910-COA-R3-CV, 2005 Tenn. App. LEXIS 558, at *9-10 (Tenn. Ct. App. Sept. 1, 2005) (citing *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001)).

By the express terms of the GTLA, Metro is immune from suit with respect to the claims of false arrest, invasion of privacy, libel, malicious prosecution, and intentional infliction of emotional distress, a fact that the plaintiffs do not dispute. Summary judgment will therefore be granted to Metro with respect to these claims. However, with respect to the false imprisonment claim, there is no indication that Mrs. Milligan was imprisoned pursuant to a mittimus from a court, and, thus, the retention of immunity contained in Section 29-20-205(2) does not apply. *Chalmers v. Clemons*, 359 F. Supp. 2d 700, 703 (W.D. Tenn. 2005) ("The GTLA specifies that the City retains immunity solely from suits for injuries arising out of false imprisonment pursuant to a mittimus from a court. 'The City does not retain sovereign immunity under § 29-20-205(2) [for] injuries arising out of any and all false imprisonments. There is only immunity from suit for injuries arising out of false imprisonment pursuant to a mittimus from a court.'"); *Elmore v. Cruz*, No. E2001-03136-COA-R3-CV, 2003 Tenn. App. LEXIS 85, at *10-11 (Tenn. Ct. App. Feb. 4, 2003) (noting that governmental entities only retain immunity under GTLA for suits arising from false imprisonment pursuant to a mittimus, and not for all claims of false imprisonment). As such, summary judgment will not be granted to Metro with respect to the false imprisonment claim.

The survival of the remaining intentional tort claims—assault and battery and conspiracy—depends on the plaintiffs' ability to demonstrate that Metro acted negligently in allowing its employees to commit these intentional torts, *see Limbaugh*, 59 S.W.3d at 84; *Pendleton*, 2005 Tenn. App. LEXIS 558, at *11-12; *Baines v. Wilson Co.*, 86 S.W.3d 575, 581

40

(Tenn. Ct. App. 2002). Here, the plaintiffs have not adduced evidence directly demonstrating Metro's negligence with respect to this allegedly intentional conduct. As such, summary judgment will be granted to Metro with respect to these claims.

However, with respect to the claims against Metro for negligence and negligent infliction of emotional distress, the court concludes that the evidence adduced by the plaintiffs and discussed in detail *supra* regarding the functioning of the Warrants Division, specifically the data entry and radio verification processes, creates a genuine issue of fact as to whether Metro's actions constituted negligence, particularly in light of the fact that Metro appears to have been aware that those processes resulted in false arrests prior to Mrs. Milligan's false arrest.

## CONCLUSION

For the reasons discussed herein, the motion for summary judgment filed by the defendant Sinclair Television of Nashville, Inc. will be granted, and the motion for summary judgment filed by the defendant Metropolitan Government of Nashville and Davidson County will be granted in part and denied in part. In addition, the motion to amend filed by the plaintiffs will be granted except with respect to those matters stricken by the court's April 30, 2009 Order.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

41